## HARVEY *v.* UNITED STATES.

1. The rules touching the effect of the findings of fact by the Court of Claims do not apply to the hearing of an appeal from its adjudication on a claim whereof it took cognizance under a special act of Congress, which required it to exercise equity jurisdiction. This court, on such an appeal, must determine the facts as well as the law applicable thereto.

2. The advertisement by the officer in command of the arsenal of the United States at Rock Island, Illinois, inviting proposals, and the written bid in connection therewith, which he accepted, constitute the terms agreed on by the United States and the successful bidder, for building the masonry of the piers and abutments of the bridge at Rock Island. It appearing that the formal contract subsequently drawn up was intended to embody only those terms, but that by accident or mistake it varied essentially therefrom, — *Held,* 1. That it was competent for the Court of Claims, proceeding as a court of equity jurisdiction under the authority of the act of Aug. 14, 1876, c. 279 (*infra,* p. 680), to reform the contract, and then determine and adjust the accounts of the parties thereunder arising. 2. That the accepted bid did not embrace the coffer-dam work.

APPEAL from the Court of Claims.

The facts are stated in the opinion of the court.

*Mr. Enoch Totten* for the appellants.

*The Solicitor-General,* with whom was *Assistant Attorney-General Simons,* for the United States.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

On the 12th of May, 1869, General Rodman, in command of the United States Arsenal at Rock Island, Illinois, caused to be published the following advertisement, in pursuance of law:—

"PROPOSALS FOR BRIDGE MASONRY.

"Sealed proposals will be received at this arsenal up to 10 o'clock A. M. on the twenty-fifth day of May, 1869, for the construction of the piers and abutments of the railroad and wagon-road bridge to be built to connect the island of Rock Island with the city of Davenport. It is proposed to build, say, five common piers, one draw-pier, and two abutments. The stone and cement required for the work will be furnished on railroad cars, on arsenal switch, near the island end of the proposed bridge, and the sand required for the cement will be furnished by the United States at or near the same point. All the masonry must be of the best quality of bridge masonry, the stones in each course must be well banded, and each course well secured by dowels to the course below under cut-water, and at lower end of piers, and the foundation courses must be fairly bedded and well secured to the rock-bed of the river, the work as it progresses being subject to the inspection and approval of the commanding officer of the arsenal, or such other officer or person as may be designated by proper authority. Detailed information with regard to the general form and dimensions of the piers and abutments, and a profile of bed of river, can be obtained by personal application at the arsenal. The total amount of masonry is estimated at about 10,000 cubic yards. All the piers and abutments will be required to be completed prior to the first day of December, 1869. Parties making bids will state the price per cubic yard of solid masonry at which they are willing to complete the work, the United States furnishing the stone, cement, and sand, as above stipulated, and nothing more. They will also make a bid stating separately the price per cubic yard of solid masonry at which they will undertake to build the piers and abutments, the United States furnishing the stone, cement, and sand, as above, and the price at which they will agree to put in the necessary coffer-dams with their protections. Proposals will be indorsed 'Proposals for Bridge Masonry,' and addressed to the undersigned. The United States reserves the right to reject any bid not deemed satisfactory.

"T. J. RODMAN,

"*Lt. Col. and Bvt. Brig. Gen. U. S. A., Commanding.*"

The appellants put in the following proposal : —

"ROCK ISLAND, May 25th, 1869.

"We propose to build the masonry of piers and abutments of the Rock Island bridge, as per annexed advertisement : —

| | |
|---|---|
| Small-piers and abutments, per yard . . . . | $11 00 |
| Draw-pier, per yard . . . . . . . . . . | 13 00 |

"HARVEY & LIVESEY,

"Madison, Wisconsin."

The only other proposal put in was one by Reynolds, Saulpaugh, & Co., as follows : —

"ROCK ISLAND, ILL., May 25th, 1869.

"Brig.-Gen'l T. J. RODMAN, *Com'd'g Rock Island Arsenal.*

"SIR, — We respectfully propose to build your piers and abutments for the rail and wagon road bridge between the island of Rock Island and the city of Davenport, in accordance with the terms of your advertisement of May 12, 1869, at prices as follows :

"Solid masonry at $19.10 per cubic yard in the work complete, the United States furnishing the stone, cement, and sand, as stipulated, and nothing more. This price is based on 10,000 cubic yards of masonry in the work when completed. Or, as per your second plan, at prices as follows : —

"Solid masonry at $12.70 per cubic yard in the work complete, the United States furnishing the stone, cement, and sand, as above, and build the coffer-dams at prices as follows : —

| | |
|---|---|
| For pier No. 1, dam 18 feet high . . . . . . . | $7,800 |
| For " 2, " 15 " . . . . . . . | 34,900 |
| For " 3, " 13 " . . . . . . . | 6,000 |
| For " 4, 5, & 6, 12 " . . . . . . . | 15,000 |
| | $63,700 |

"The above prices for dams include the protections to the same, complete.　　　　　Respectfully yours,

"REYNOLDS, SAULPAUGH, & Co."

The bid of the appellants was accepted. A contract was then drawn by a clerk of General Rodman's. A rough draft of it was submitted to the appellants, and, on their returning it as satisfactory, the engrossed copies were prepared for signature, and the contracts were executed and interchanged, bear-

ing date June 1, 1869. The following are the provisions of the contract which are material to this case: " The parties of the first part do hereby contract and engage with the said United States to construct the piers and abutments for the new rail and wagon bridge, to be built to connect the island of Rock Island with the city of Davenport, in accordance with such plans and specifications as may be fixed by proper authority acting for the United States; the United States to furnish stone, cement, sand, and all necessary templets required for the work, and nothing more; the stone and cement to be delivered in cars at the government switch on the island, near the site of the work. . . . The character of the work to be daily inspected as it progresses by such officer or other person as the commanding officer of the Rock Island arsenal or other authority appointed by the United States, may designate; such inspector to have full authority to give any directions with regard to the character or manner of conducting the work. The whole work to be completed prior to the first day of December next, provided that the stone shall be delivered at the rate of 2,000 cubic yards per month; and, in case of any failure on the part of the United States to deliver this amount of stone, then the work to be completed as soon after the first day of December next as practicable. . . . Payment in such funds as the Treasury Department may provide, at the rate of thirteen (13) dollars per cubic yard for all masonry in the draw-pier, and at the rate of eleven (11) dollars per cubic yard for all other masonry. . . . It is further stipulated and agreed, that if any default shall be made by the parties of the first part in the performance of their work specified in this contract, of the quality and at the times and places therein provided, that then, in that case, the United States shall have the right to take entire and exclusive charge of the work, and to complete it in accordance with the conditions prescribed by this contract, charging us with the entire cost of completing it, and crediting us with the amount per cubic yard heretofore stipulated to be paid us for the completing of the work."

On the 14th of December, 1870, the appellants filed a petition in the Court of Claims praying a judgment against the United States for $200,400. The petition set forth that the con-

tract was one for doing the masonry work in and about the construction of the piers and abutments; that proposals were invited for said work, and also separate proposals for putting in the necessary coffer-dams and their protections, but the petitioners bid only for said masonry work in the construction of said piers and abutments; and that their bid, being the lowest one for said masonry work, was accepted, and the contract was awarded thereon. The petition made the following claims, by items, against the United States: 1. For damages incurred by reason of the unreasonable delay caused by defendants from June 7, 1869, to Sept. 4, 1869, $25,000; 2. For putting in coffer-dams and protections, for pumping the water therefrom, and for preparing the beds for the piers and abutments, $75,000; 3. For loss of profits incurred by the unlawful reduction of the dimensions of the piers and abutments, $33,600; 4. For increase in the cost of the work, by having been compelled to do it in cold weather, $15,000; 5. For constructing 4,400 cubic yards of masonry, at, say, $12 per yard, $52,800; 6. For loss caused by neglect of defendants to furnish materials and locate piers and abutments, whereby the plaintiffs, their workmen and tools, were kept idle, $15,000; 7. For loss of machinery, vessels, and tools, caused by the ejectment of the plaintiffs from the work, $25,000; 8. For dressing coping and corners of abutments, and dressing noses of piers under water, not required by contract, $5,000. This made a total of $246,400, on which $46,000 was credited as paid, leaving a balance of $200,400. The petition contained allegations bearing upon each one of the eight items claimed, but it is not necessary here to refer to any but those in respect to items 2 and 3, which allegations were as follows: " That about the thirteenth day of September, 1869, the United States having furnished materials sufficient to commence the construction of said piers and abutments, the petitioners requested the agent of the defendants to put in, or cause to be put in, the necessary coffer-dams and to pump the water therefrom, and prepare beds for said piers and abutments, to enable petitioners to proceed with the performance of their contract. But the United States refused to put in such coffer-dams and pump the water therefrom, and refused to prepare said beds, pretending that petitioners were bound, under said contract, to

put in said coffer-dams. The petitioners thereupon protested against such wrongful construction of said contract, but, at the special request of the defendants, and relying upon the good faith of the United States, they undertook to and did put in the necessary coffer-dams and protections, and pump the water therefrom, and did prepare the beds for said piers and abutments. That the labor and materials expended in putting in said coffer-dams and protections, and pumping water and preparing beds as aforesaid, was reasonably worth, and they are entitled to recover for the same from the United States, the sum of seventy-five thousand dollars. That they were informed by the United States, prior to the making of said proposal, that the draw-pier would be four hundred and seventy-four feet long and fifty-six feet wide, and that the five common piers would be each seventy-four feet long and fourteen feet wide, and that, with the abutments, there would not be less than ten thousand cubic yards of masonry work, and that petitioners based their estimates for said work upon such information, and made their said proposal in the belief that said piers and abutments would be constructed according to such dimensions. But they allege that the defendants, on or about the twenty-second day of July, 1869, transferred the supervision of said work from the Ordnance Bureau to the Bureau of Engineers, and that the petitioners, although they were at all times ready and anxious to proceed with said work, were kept waiting from the seventh day of June, 1869, until September 7th, 1869, as aforesaid, and that, on or about the said seventh day of September, 1869, the defendants marked out the location for one pier and one abutment only, and wrongfully reduced the dimensions of all the said piers and abutments, so that, instead of measuring ten thousand cubic yards, they measured only about six thousand five hundred; and that, by reason of said reduction, by said defendants, in the dimensions of said piers and abutments, the petitioners have been damaged in the full sum of thirty-three thousand six hundred dollars."

Subsequently the petitioners amended their petition as to item 5, so as to make it read as follows: "For handling, cutting, preparing, and setting stone for and in the piers and abutments, $82,000." The United States, by answer, denied every

allegation in the petition, and set up a counterclaim for $33,-681.35, alleging that, under the contract, the petitioners being in default, the United States took charge of the work and completed it, and charged the petitioners with the entire cost of completing it, $142,457.17, and credited them with the amount per cubic yard stipulated in the contract to be paid them for completing the work, $108,775.82, leaving a balance due to the United States from the petitioners of $33,681.35.

Proofs were taken, and the case was heard by the Court of Claims. It awarded to the petitioners $20,068, in respect of items 1 and 6. As to item 2, the court found that it was necessary, in order to the laying of the abutments and piers, that a coffer-dam should be built for each abutment and pier, and the water pumped out of it, and the bed of the river prepared for laying the masonry of the abutment or pier thereon; that without such coffer-dams it was impracticable to construct any of the abutments or piers; that the petitioners, on the 13th of September, 1869, requested the United States to forthwith construct the requisite coffer-dams, exhaust the water therefrom, and prepare the bed for the piers and abutments where necessary for the commencement of the work; that the United States, on the next day, refused so to do, on the ground that, under the contract, it was the business of the petitioners to do the work; that on the next day the petitioners protested against such refusal, and notified the United States that they should proceed at once to build the dams, pump the water therefrom, and prepare the beds, and should hold the United States for the payment of the costs and expenses of the same; that on the next day General Warren, in charge of the construction of the bridge, consented, in order not to delay the work, to its going on until the matter could be referred to the Attorney-General of the United States, but stated that in such consent it must be considered that nothing was admitted in favor of the claim of the petitioners to their interpretation of the contract; that, immediately upon such refusal of the United States, the petitioners proceeded to build the requisite coffer-dams; and that all that was required in that respect while the work was in their hands was done by them. But the court found, as a conclusion of law, that the contract did not require the United States, but

required the petitioners, to do the work named in item 2. As to item 3, the court found that about the 17th of July, 1869, General Rodman was relieved from the charge of the construction of the bridge by General Warren, of the corps of engineers; that General Warren, on the 22d of August, 1869, caused notice to be given to the petitioners that the position of the abutment and first pier of the bridge, on the Iowa side, was determined and marked, ready for them to commence their construction; that, when proposals were so invited by advertisement, General Rodman had prepared certain plans of the bridge, intended to show the general forms and dimensions of the piers and abutments, and a profile of the bed of the river; that those plans were seen and inspected by the petitioners before they sent in their said proposal; that the dimensions of the piers of the bridge which were fixed upon on the 22d of August, 1869, and those which were, after that date, from time to time fixed upon, were less than the dimensions indicated in the plans prepared by General Rodman and shown to the petitioners before they made their said proposal; but that there was no reduction of the sizes which were fixed upon on the last-named day, nor was there any reduction of the sizes thereafter adopted. The court found, however, as a conclusion of law, that the reduction made in the dimensions of the piers and abutments of the bridge, as originally projected, was not, by the legal construction of the contract, wrongful to the petitioners. As to item 4, the court found that the petitioners were not subjected to any increase in the cost of the work by having been compelled to do it in cold weather. The court also found that on the 6th of October, 1870, the petitioners were notified in writing by the officer in charge of the work on the bridge, that in consequence of complaints which had reached the chief of engineers of the United States army, of the tardy progress of the work on the masonry of the bridge, the said officer had been required to take suitable and efficient measures to expedite the work, and that, in view of that requirement, he would take the work as it stood and carry it on under the provision of the contract which contemplated such a change; that on the next day the petitioners, in writing, refused to give up the work, whereupon, on that day, the said officer

notified them in writing that he would on the next day take possession of the work for the government, which he did, against the assent and protest of the petitioners; and that thenceforward the work was prosecuted by the officers of the government. In regard to item 5, as amended, the court found that the petitioners, before their ejectment from the work, had done work upon and for the bridge, under the contract, to the amount of $76,344.47, and had been paid on account of said work $54,105.98, leaving due to them under item 5, $22,238.49. As to item 7, the court found that the petitioners did not sustain any damage by reason of the idleness of their tools, machinery, and vessels, after Oct. 8, 1870, which they would not have sustained had they on that day completed their work under the contract, or which was not incident to the termination, at any time, of their work under the contract. As to item 8, the court found that the petitioners were paid in full for all the extra work they did on or about the abutments and piers of the bridge. The court awarded to the petitioners $42,306.49, being $20,068 on account of items 1 and 6, and $22,238.49 on account of item 5, and rejected their claims under items 2, 3, 4, 7, and 8.

The opinion of the Court of Claims, in deciding the case, is found in 8 Ct. of Cl. 501. From that it appears that, in regard to item 2, the court held that neither the advertisement nor the bid could be invoked to interpret the contract; and that the proper construction of the contract was that it was the duty of the petitioners to build the coffer-dams, pump the water therefrom, and prepare the bed of the river for the piers and abutments which they were bound to construct. In regard to item 3, the court held that under the contract the officer in charge had the power to make the alterations in the dimensions of the piers which made the profits to the petitioners less.

The Court of Claims having no equitable jurisdiction to reform a contract, the petitioners acquiesced in the decision made, so far as not to take an appeal to this court, and to receive payment from the United States of the amount of the judgment for $42,306.49; but they applied to Congress, and procured the passage of the act of Aug. 14, 1876, c. 279 (19

Stat. 490), which provides as follows: " That the claim of James W. Harvey and James Livesey for alleged labor done and materials furnished under their contract with the United States for the building of the masonry-work for the piers and abutments of the bridge across the Mississippi River from Rock Island to Davenport, Iowa, bearing date June first, eighteen hundred and sixty-nine, be, and the same is hereby, referred to the Court of Claims, for hearing and adjudication; and to that end jurisdiction is hereby conferred, on said court to proceed in the adjustment of the accounts between said claimants and the United States, as a court of equity jurisdiction; and may, if according to the rules and principles of equity jurisprudence, in its judicial discretion, reform said contract and render such judgment as justice and right between the claimants and the said government may require."

On the 30th of August, 1876, the petitioners filed in the Court of Claims a petition, which recites the former proceedings, and the judgment, and its payment, and the contents of the said act of Congress, and then proceeds as follows: " The plaintiffs allege that there is still justly due to them from the United States a large sum of money for damages and for work and materials, and, in addition to the charges made in the aforesaid original petition, they say that connected with the pivot-pier of said bridge there were large walls of stone masonry and crib-work, connecting the upper and lower rests of the pivot-pier with the pivot thereof, which were constructed mainly of irregular or rip-rap masonry, and that, to finish the abutment on the Iowa shore, wing-walls, constructed of ' riprap ' masonry, were necessary, all of which was a part of the plaintiffs' work under the contract; that, this work being cheap and easily done, the officers in charge of said work in behalf of the United States refused to permit the plaintiffs to do it, and employed laborers and constructed the same for the United States, and thus unjustly and unlawfully deprived the plaintiffs of large profits, which they otherwise would have made. They allege that they could have made, on the said work, the sum of $51,000 in profits. The plaintiffs aver that there is justly and equitably due to them from the United States, on account of the premises, and in addition to the

amount already paid to them, the sum of $239,600, with interest, according to the following specifications, to wit: 1. For labor done, and materials furnished by the plaintiffs, in constructing the coffer-dams, and in performing the work necessarily connected therewith, and, preliminary to the masonry-work for said piers and abutments, $75,000; 2. For loss and damages resulting to the claimants in consequence of the reduction of the dimensions of the piers and abutments, made subsequently to the making of the contract, $33,600; 3. For loss of machinery, vessels, and tools, caused by taking from the plaintiffs the work under their contract, $25,000; 4. For extra work, dressing coping and corners of abutments, and dressing noses of piers under water (this work not being required by the contract), $5,000; 5. For the profits they could have made had they been permitted to build the cross-walls and crib-work connecting the upper and lower rests with the pivot (part of the contract), $48,000; 6. For profits they might have made had they been permitted to construct the wing-walls for the Iowa shore abutment; these walls were ' rip-rap,' and a part of the work under the contract, out of which liberal profits could have been made; the agents of the United States performed the work, $3,000; 7. For profits they might have made had they been permitted to complete the work according to the intention of the parties and the terms of the contract, in addition to the foregoing charges, $50,000; 8. For interest on the amount found due to the claimants on an equitable adjustment of accounts between the parties, from October 6th, 1870, until the date of the judgment of this court, at the rate of six per centum per annum. The petitioners therefore claim judgment against the United States for the sum of $239,600, with interest thereon at six per centum per annum; and they pray the court to reform the said contract, if the same be necessary, so as to make the same conform to the intention of the parties and to be in consonance with justice and equity, and for such other and further or general relief as in justice and right they may be entitled to have." The United States demurred to this petition on the ground that it did not allege facts sufficient to constitute a cause of action. The court sustained the demurrer and gave leave to the petitioners to amend the peti-

tion. '12 Ct. of Cl. 141. One of 'he grounds on which the court proceeded was, that so far as the demands covered by the new petition are legal demands, under the contract, enforceable in a suit at law founded on the contract, such demands cannot, under the special act of Congress, come under the cognizance of the court. This view is, in our judgment, correct. The court further held, that there were no averments in the petition showing a title to equitable relief founded on the view that the written contract did not set forth the true agreement, and no facts alleged showing a right to recover on the reformed agreement. It was held that the court was to proceed simply "as a court of equity jurisdiction," and that the accounts which it could adjust and the relief which it could give must be limited to matters which, because of its inability to sit as a court of equity, it could not and did not before determine.

A comparison of the new petition with the first petition shows that items 1, 2, 3, and 4 in the new petition are severally reproductions of items 2, 3, 7, and 8 of the first petition; that items 5, 6, 7, and 8 in the new petition are entirely new; and that items 1, 4, 5, and 6 in the first petition are not reproduced in the new petition, an award having been made in the judgment in respect of items 1, 5, and 6 in the first petition, and item 4 therein being abandoned.

The petitioners proceeded, under the leave granted, to amend their petition in equity, by adding thereto the following allegations:. "The contract mentioned in the original petition in this cause was intended to carry out and execute the specifications and agreements contained in a certain advertisement or invitation for proposals for constructing the piers and abutments of the said bridge, published by the defendants, and in a bid made in pursuance thereof by the plaintiffs. The agents of the United States, by said advertisement, requested the persons bidding in pursuance thereof to state (1) the price per cubic yard of solid masonry at which they were willing to complete the work; (2) the price per cubic yard of solid masonry at which they were willing to build the piers and abutments; and (3.) the price at which they were willing to put in the necessary coffer-dams and protections. The said invitation for proposals also apprised the bidders that detailed information as to the

general form and dimensions of the piers and abutments, and a profile of the bed of the river, would be exhibited to them at the arsenal.    In pursuance of that part of the said invitation which referred to the work of building the solid masonry of the piers and abutments, and after having first obtained from the defendants' agents detailed information touching the form and dimensions of the proposed piers and abutments, and after having examined the profile of the bed of the river exhibited by the defendants, the plaintiffs, on the twenty-fifth day of May, 1869, submitted to the proper officers of the United States a proposal in writing, whereby they offered to build (only) the masonry of the said piers and abutments, upon the terms following, to wit, the small piers and abutments at and for the sum of eleven dollars per yard, and the draw-pier at and for the sum of thirteen dollars per yard.    The said proposal was accepted by the defendants, and the said contract, in the original petition described, was prepared in the office of the agent of the United States, by a clerk therein employed, but, in consequence of accident and mistake, the said contract was so drawn as to depart from the intention of the parties and from the terms and specifications in said invitation and proposal contained.    Instead of requiring the plaintiffs to perform the labor and furnish the materials contemplated by the said invitation and proposal, and in the manner specified therein, the language employed in said contract inequitably required the plaintiffs 'to construct the said piers and abutments in accordance with such plans and specifications as may (might) be fixed by proper authority acting for the United States.'    The plaintiffs did not discover the peculiar language of the said contract until long after the work had been in progress, nor did they ever believe that they were bound by said contract to do any more work, or furnish any more materials, or that they were obliged to perform the work in any other manner, than as specified and contemplated in the said invitation and proposal, until the judgment of this court compelled them to submit to said construction.    When the officers of the defendants first claimed for the said contract the strict construction aforesaid, the plaintiffs protested, and refused to proceed any further with the work, but the said officers, by promises (which they never

kept), induced the plaintiffs to go on, notwithstanding the dispute, and they accordingly did proceed, and they were required by the agents of the United States to construct the coffer-dams and do all other work and furnish all other materials preliminary to building the solid masonry for said piers and abutments, and to construct said piers and abutments on very materially different plans and in different localities from those contemplated by the parties at the time of making said proposal, and said piers and abutments so built were, in consequence of the alterations in the form and locality thereof, much more expensive to the plaintiffs, for which no allowance has ever been made to them. Through the error and mistake aforesaid, the defendants were given an unfair and unconscionable advantage over the plaintiffs, and have obtained the materials, labor, and skill of the plaintiffs, of great value, and have paid nothing for them. The labor performed and the materials furnished by the plaintiffs for the United States, in putting in said coffer-dams and furnishing the other materials and performing the other work preliminary to building the masonry of said piers and abutments, were reasonably worth the sum of seventy-five thousand dollars ; and the work done and materials furnished by them for the United States in and about the masonry of said piers and abutments were reasonably worth, in consequence of the change of locality and of plans and specifications unlawfully made by the defendants under the erroneous provisions of said contract, the sum of thirty-three thousand and six hundred dollars, over and above the sums which the plaintiffs have already been paid therefor. The plaintiffs, therefore, pray that the said contract may be so reformed as to correspond with the intention of the parties, and that they may be paid for the labor and materials by them performed and furnished upon the said bridge. They further pray that they may have such other and further relief, and be paid such other and further sums of money, as may be agreeable to equity and good conscience, and as the provisions of said act of Congress may authorize and require."

By leave of the court, the petitioners filed a second amendment to the petition in equity, stating as follows, in addition to what was contained in said petition and the first amendment

thereto : " *First,* By the terms of the advertisement inviting proposals, the proposal of the plaintiffs, and the acceptance thereof by the defendants, as alleged in the original petition herein and the amendment thereto, a preliminary agreement was made between the plaintiffs and the defendants, by which the plaintiffs agreed to build the masonry-work of the piers and abutments of the said bridge at Rock Island, for the prices stated in the said original petition and the amendment thereto, and according to certain plans showing the general form and dimensions of the piers and abutments and their locations in the river, and according to a profile showing the bed of the river at the place where the work was to be done, which plans and profile were, before the making of the proposal, exhibited by the defendants to the plaintiffs, and were by them inspected, to enable them to prepare their estimates for making their said proposal.—And the United States thereby agreed to furnish the stone, cement, and sand for said masonry, and also to erect and put in the necessary coffer-dams, with their protections, and to perform the preliminary work necessary to enable the plaintiffs to build the said masonry-work according to their said proposal and according to said general plans, and at the location in the river indicated by said plans and profile. *Second,* For the purpose and with the intent and design of carrying into effect said agreement thus made as aforesaid, a formal contract was prepared by officers of the United States, which was afterwards signed and delivered by both parties; but, by accident and mistake, the said contract did not conform to the terms of said previous agreement, nor to the intention of the parties. The said contract was, by such accident and mistake, so drawn as to impose upon the plaintiffs the burthen and expense of constructing and putting in the necessary coffer-dams with their protections, and of performing the preliminary work connected therewith, instead of requiring the United States to put in said coffer-dams and perform said preliminary work, as had been previously agreed upon, and as was intended by the parties. The cost of constructing and putting in said coffer-dams with their protections and doing the preliminary work connected therewith, was as great, if not greater than the cost of building the masonry-work, and, in consequence of the said

accident and mistake, the United States obtained an uncon-
scionable advantage over the defendants, and compelled them
to do work and furnish materials which they never intended to
do, and for one-half the compensation the said work and mate-
rials were really worth.   And the said contract, through acci-
dent and mistake, was so drawn as to require the plaintiffs to
build the said piers and abutments in accordance with such
plans and specifications as might be fixed by the officers of the
United States, instead of requiring the United States to provide
plans, and the plaintiffs to do their work, according to the gen-
eral plans and profile exhibited to the plaintiffs, as aforesaid,
and at the location in the river agreed upon, as was the inten-
tion of the parties, and as had been previously agreed upon by
the parties.   And the defendants, through said accident and
mistake, have obtained an inequitable and unconscionable ad-
vantage over the plaintiffs, and, in the construction of the said
bridge, changed its locality further down the river and into
deep water, and reduced the dimensions of the piers and abut-
ments as prescribed by said original plans, in such a manner as
to preserve the cut-stone or expensive portion of the work, and
to greatly reduce the quantity of rough, inexpensive work,
through which alone profit could be derived by the plaintiffs,
and thereby inflicted great injury upon the plaintiffs.   The pe-
titioners submit to the court that they are entitled to have said
contract reformed, so as to make it conform to the intention
and to the agreement of the parties, as expressed in the said
invitation for proposals and the bid of the plaintiffs submitted
in response thereto, and the acceptance thereof by the defend-
ants, and to have the same judgment and relief as to the said
coffer-dams and the work of constructing the piers and abut-
ments as if the said formal contract had conformed to the said
preliminary agreement and had contained the necessary pro-
visions requiring the defendants to construct and put in the
necessary coffer-dams and to perform the preliminary work
connected therewith, and so as to conform in all things in ref-
erence to the construction of the said bridge and piers and
abutments, to the said original and general plans of said bridge,
and to the profile of said river-bed, and to the location thereby
indicated.   And the petitioners claim such other and further

relief in the premises as their case may require, and as may be authorized by the terms of the said act of Congress passed for their relief."

The United States, by answer, denied all the allegations of the petition and the amendments. The evidence in the first case was used as evidence in the second case, and no new evidence was taken. The court entered a general finding in favor of the defendants and dismissed the petition. From the decree of dismissal the petitioners have appealed to this court.

The reasons assigned for that decree are contained in the opinion of the Court of Claims, which is a part of the record, and is also reported in 13 Ct. of Cl. 322. The court says, that because of the decision on the demurrer it regards the present proceedings as relating only to the claims for the cost of the coffer-dams and for the loss of profits resulting from the reduction of the dimensions of the piers and abutments, being items 1 and 2 in the new petition. In regard to item 1, the decision is that the petitioners have not shown that the written contract does not express the intent of both parties as to the coffer-dams; and that even if the court were satisfied that the petitioners executed the contract in mistake of their rights, there is no evidence that the defendants shared the mistake. In regard to item 2, the decision is that the court would be disposed to regard the case, on the facts, as one for equitable interposition for the purpose of further inquiry, and the ascertainment of the rights of the parties in equity, if it had jurisdiction; but that the statute does not authorize it to entertain those considerations, because in these proceedings it can hear and determine only claims for labor done and materials furnished by the plaintiffs under their contract with the defendants.

In regard to the coffer-dams, it seems clear to us that the ruling of the Court of Claims was erroneous. The advertisement begins by inviting proposals for the construction of the piers and abutments of the bridge. Standing alone, this would involve proposals to make coffer-dams, and do and furnish everything else necessary to finished work. But this is qualified by what follows. The advertisement goes on to say that parties making bids will state (1) the price per cubic yard of

solid masonry at which they are willing "to complete the work," the United States furnishing the stone, cement, and sand, "and nothing more." "To complete the work" there means to construct the piers and abutments complete, including the making of coffer-dams and doing and furnishing everything necessary for completed work, except furnishing stone, cement, and sand, the United States furnishing those, and furnishing nothing more. Then parties making bids are "also" to make a bid stating (2) separately the price per cubic yard of solid masonry at which they will undertake to build the piers and abutments, the United States furnishing stone, cement, and sand; and "also" to make a bid stating (3) separately the price at which they will agree to put in the necessary coffer-dams, with their protections. Here are three distinct classes of bids: bid 1 for the whole work, including all that is embraced in the work specified in bids 2 and 3; bid 2 for a part of the whole work specified in bid 1 and excluding what is embraced in bid 3; and bid 3 for another part of the whole work specified in bid 1 and excluding what is embraced in bid 2. There is no implication in the advertisement from the use of the word "also," or from any other language, that a bidder could not make bid 2 or bid 3 unless he likewise put in a bid for bid 1; or that he could not bid for the specified parts of the work unless he should bid for the whole complete. The appellants did not make a bid for the work complete, or say in their bid that they were willing to complete the work. They bid only under bid 2. They stated separately, in their bid, the price per yard at which they would build the masonry of the piers and abutments. They excluded bid 3 and the coffer-dams, and they excluded bid 1 and the coffer-dams in it. This is quite enough to determine the question. The written bid in connection with the advertisement, and the acceptance of that bid, constituted the contract between the parties, so far as regards the question whether the contract prices embraced the coffer-dam work. *Garfielde* v. *United States*, 93 U. S. 242; *Equitable Insurance Co.* v. *Hearne*, 20 Wall. 494. The written contract, in that respect, was intended by both parties to be merely a reduction to form of the statement as to work and prices contained in the bid. If the formal contract is suscep-

tible of a different construction, to the prejudice of the contractors, it is very plain that not only the contractors but the officers of the government were under a mistake. It is shown that the work of making and putting in the coffer-dams, and doing whatever else was necessary, in connection with them, before the laying of the masonry could be commenced, was so expensive as to make it impossible that the prices named in the bid of the appellants could have covered that expense and the laying of the masonry also. There is no evidence to show that the parties intended to alter the terms of the bid as to work and prices. There are other considerations dwelt upon in the dissenting opinion of Judge Nott in the Court of Claims, and to which it is necessary only to refer, which enforce the conclusion thus reached. One of those considerations is, the terms of the only other bid, as showing by the prices therein named for bid 1, bid 2, and bid 3, each separately, that the appellants could not have been bidding for the work complete. The evidence on the point in question on the part of the appellants is largely in documents, while that relied on by the United States is oral, and some of it consists of recollections of conversations with the appellants, who are debarred by statute from being witnesses in their own behalf. We are of opinion that by the actual contract between the parties the appellants were not to do any of the work covered by the claim made by them under item 1 of the petition herein, and that the written contract must be reformed accordingly.

We are also of opinion that the Court of Claims placed too limited a construction upon the special act of Congress. The act speaks of the claim of the appellants as a claim " for alleged labor done and materials furnished under their contract with the United States for the building of the masonry-work for the piers and abutments of the bridge," giving the date of the contract. The Court of Claims had rejected item 2 in the first case because the formal written contract required the petitioners to do the work named in it. It had rejected item 3 because that contract gave the government power to reduce the dimensions of the piers and abutments. It was to obtain equitable relief in respect to those two items that the appellants applied to Congress. Their claim had been made in the

eight items embraced in their petition in the first case. It had been made as a claim under their contract. It cannot be properly inferred, unless there is language necessarily leading to a contrary conclusion, that the claim referred to the Court of Claims by the act is to embrace less than what was embraced in items 2 and 3 in the first case, although item 3 is made out as for " loss of profits." The act refers " the claim " " under the contract," for hearing and adjudication; and jurisdiction is conferred on the court to proceed in the adjustment of " the accounts " between the persons making the claim and the United States, as a court of equity jurisdiction. The court had decided that it could not take cognizance of item 3 because it was not a court of equity jurisdiction, and, therefore, could not proceed to adjust the accounts any further than it had adjusted them. One object of the act was to remedy this defect. There is nothing in the use of the words " for alleged labor done and materials furnished," or of the words " to that end," which can limit or control the scope of the act, as above explained. That scope is still further shown by the enactment that the court " may, if according to the rules and principles of equity jurisprudence, in its judicial discretion, reform said contract and render such judgment as justice and right between the claimants and the said government may require." The words " for alleged labor done and materials furnished " are, in view of the language of the entire act, not words of limitation, but words of description. The court is authorized to adjust " the accounts " between the parties, so far as they were not legal demands, and so far as they were equitable demands, unadjusted or unadjudicated, growing out of the contract, as a court of equity, and, for that purpose, to reform the contract, according to the principles of equity, and then render judgment upon it as reformed. This power of the Court of Claims, under the act, extends to reforming the contract in respect to permitting the officers of the United States to materially vary the plans for the piers so as to essentially change the obligations of the parties.

As to items 3 and 4 in the new petition, which are the same as items 7 and 8 in the former case, not only were they legal demands, but they were adjudicated upon fully in that case and

cannot be reopened.   As to items 5, 6, and 7 in the new peti-
tion, they cannot, in view of the principles laid down in this
opinion, be considered by the Court of Claims.   The question
of interest, under item 8, remains for that court to consider.

It is contended on the part of the United States that this
court cannot, under its rules, hear this appeal, because there is
not, in the record, any finding by the Court of Claims of the
facts in the case, in the nature of a special verdict, with a sep-
arate statement of the conclusions of law upon such facts.
But the rule in regard to findings of fact has no reference to
a case like the present, of equity jurisdiction conferred in a
special case by a special act; and, in such a case, where an
appeal lies and is taken under sect. 707 of the Revised Stat-
utes, this court must review the facts and the law as in other
cases in equity, appealed from other courts.

*Judgment and decree reversed, and the case is remanded with
directions to proceed in it according to law and in confor-
mity with the opinion of this court.*