Campbell, Chief Justice,
delivered the opinion of the court:
Recovery is sought in this case under the provisions of the act of March 2, 1919, 40 Stat. 1272, known as the Dent Act, the claim being based upon an oral agreement alleged to have been made between plaintiff and authorized representatives of the Secretary of War. It presents some unusual features, one of which is that reformation of a contract in writing between the plaintiff and the United States is asked, not for the purpose of enforcing any of the provisions of this written instrument as thus reformed, but in order that proof by parole may be made of an alleged oral agreement entered into before the execution of the written contract. The facts establish the written contract dated February 26,1918, a copy of which is attached to the petition as Exhibit B. A photostat copy of the original contract is made part of the special findings but, for convenience, reference will be made to Exhibit B. In this contract the plaintiff undertook to manufacture and deliver to the Government 80 million cartridges of the 8-millimeter French Lebel type, which, at the stated price of $47.50 per thousand, called for payments to the amount of $3,800,000. The number of cartridges was largely increased by one or more supplemental contracts. The contract and its four supplements were duly performed, the cartridges having been made and delivered and the plaintiff duly paid for them. It is not now claimed that anything further is due upon it.
When the plaintiff undertook to make the 8-M/M cartridges it was actively engaged in the manufacture of .30-caliber ball cartridges for the United States under contracts calling for large quantities of this kind. To suspend or curtail the manufacture of the latter and adapt its plant equipment to the making of the 8-M/M cartridges necessitated changes and rearrangement of tools, appliances, and ma *495 chinery and a consequent expense. It is for this transformation expense that suit is brought. The petition alleges that officers representing the Secretary of War agreed with plaintiff’s officers that these transformation expenses would be repaid to it and that it proceeded with the work of transforming its plant and machinery in reliance upon this agreement, the terms of which are stated in the petition as follows:
“ The petitioner further states that the officers and agents of the Secretary of War in good faith agreed on behalf of said Secretary of War and the United States to repay to petitioner its reasonable necessary expense directly incurred by it in the transformation and preparation of its said factory and appliances for the production of said 8-M/M cartridges but that payment of such expense to petitioner was never provided for in any written agreement executed .in the manner prescribed by law.”
The written contract does not provide for the repayment to the plaintiff of “ its reasonable necessary expense directly incurred ” in the transformation of the plant or machinery, and, on the contrary, has the following provision, in which, for convenience of reference, we italicize six words that plaintiff asks to be stricken out, namely:
“ The United States agrees to place at the disposal of the contractor for the purpose of this contract machinery procured from the plant of the Brass and Metals Manufacturing Company, Kansas City, Missouri, under Army Requisition dated December 28, 1917 (R 413.8/1064) ; and the contractor agrees at its own expense to care for and maintain said machinery in good working order (reasonable wear and tear excepted) and to deliver the same to the United States upon the termination of this contract.
“ The contractor agrees to make the necessary changes in the rearrangement of its plant, machinery, and tools to accommodate such of the additional machinery furnished by the United States as is utilized for the purposes of this contract, and to adapt said, plant, machinery, and tools, and said additional machinery to the purposes of this contract, and to replace the same at the termination of the contract in condition for the manufacture of caliber .30 ball cartridges without cost to the United States.”
When plaintiff’s claim under the Dent Act was presented to the Secretary of War, through the Board of Contract *496 Adjustment, it was rejected because of the quoted provisions in the written contract. Plaintiff’s petition also avers that the provision in question is in the written contract by “ inadvertence and mutual mistake,” and invokes the equity jurisdiction of the court to reform the contract. The specific change asked is the elimination of the six italicized words, namely “ said plant, machinery and tools and,” where they appear together in the second paragraph of section 7 of Article III.
Plaintiff’s claim, by Exhibit A to its petition, comprises two items, and the second of these items appears to be for expense, including overhead, directly incurred in the transformation and preparation of its machinery and plant for the production of the 8-M/M cartridges. The larger item refers to factory overhead loss growing out of the change of factory and includes loss for some months after the execution of the written contract occasioned by a diminution of production as compared with the production, under the former contract and partly to loss occasioned by delays in procuring bullets. It is very doubtful whether this item could come within the description of “ necessary expense directly incurred,” which is alleged to be the agreement that was made.
But, as already stated, the plaintiff asks that the contract be reformed. As an incident to granting proper relief under a written contract, the Court of Claims is authorized to reform it in accordance with the familiar principles in cases of mutual mistake so as to make it speak the real intention and agreement of the parties, and having done this to proceed to judgment upon the instrument as reformed. See Cramp case, 239 U. S. 221, 231; Milliken Imprinting Company case, 202 U. S. 168, 174; Boston Iron Works case, 34 C. Cls. 174. But whether the court’s jurisdiction in this branch of equity jurisprudence extends to reformation where no relief is sought or claim made upon the instrument when and as reformed, is a question not here decided, the view we take of the facts rendering it unnecessary to pass upon it. See comments in the Jones case, 131 U. S. 1, 18, upon the limitations upon the equity jurisdiction of the Court of Claims.
*497 The instant case, like the Cramp case, supra, is brought under the jurisdiction conferred upon the Court of Claims as in other cases. The Harvey case, 105 U. S. 671, referred to by plaintiff, was brought under a special act' of Congress which authorized the court to proceed in accordance with the principles of equity jurisprudence and with the latitude of a court of equity. See explanations of that case in Cramp case; Old Settlers case, 148 U. S. 427. It is said in the Cramp case: “ In cases within the general jurisdiction of the Court of Claims it has jurisdiction to reform a contract for the purpose of determining whether the claim, if established, is a valid one against the United States.” Milliken case, supra. As already stated, plaintiff does not seek relief under the contract if it be reformed. The reformation is for the purpose of enabling it to prove by parole an independent agreement, as to which we will speak later. Upon its brief is thus stated its contention: “ Plaintiff’s claim is based upon the oral promises and agreements of the Ordnance Department and upon the implied agreement arising from its compliance with its instructions. The written contract of February 26, 1918, is brought into the case to clarify its ambiguity or for equitable reformation. Plaintiff’s claim is not based upon said contract.” It seeks to set up an alleged Dent Act claim. And in this connection it may be noted that in authorizing relief in certain cases the Dent Act was not intended to change or nullify contracts that were duly executed in writing. It was intended to remedy irregularities and informalities in the mode of entering into agreements, not in writing. It does not enlarge the authority of the agents by whom they were made. The officer whose agreement is relied on must have been acting within the scope of his authority. It was not intended by the act that an officer in one branch of the military service or one of inferior rank could bind the Government by an agreement as to matters relating to an entirely different branch of the service or within the control of his superior officers and as to which he was without authority. To authorize relief under it there must have been an agreement — a meeting of the minds. See Baltimore & Ohio R. R. case. 261 U. S. 592.
*498 The claim here asserted was first presented to the St. Louis Claims Board, a subordinate of the War Department Claims Board, and was recommended for payment, but the action of this St. Louis board was taken without any knowledge of the quoted paragraph 7 of the written contract, and its conclusion was forwarded to the War Department Claims Board at Washington for its approval, which was necessary to give effect to the allowance. The board at Washington disapproved the action of the subordinate board because of the written contract. The claim was also jjresented to the Secretary of War under the Dent Act and upon a full hearing before the Board of Contract Adjustment and its successor, the appeal section, War Department Claims Board, the claim was rejected and this action was affirmed by the Secretary of War. A certified copy of the findings of fact and conclusions of this board was introduced by plaintiff as Exhibit 1 to the testimony of its secretary and is the same that appears in the published reports of the board. See Decisions of the War Department, volume 7, pp. 359-366.
We have no doubt as to the correctness of the board’s conclusion. The language of the contract is unambiguous and the words used must be given their plain and ordinary meaning. Parties are presumed to know the effect of the language they embody in their contracts. See Calderon v. Atlas Steamship Co. 170 U. S. 272, 280. Speaking of the written instrument there considered, it was said in the Bratoley ease, 96 U. S. 168, 173: “ If the contract did not express the true contract it was claimant’s folly to have signed it.” But plaintiff contends that there should be an elimination from the contract of the six words in paragraph 7 which we have italicized. The rule unquestionably is that “ the mistake must be mutual and common to both parties to the instrument.” Moffett, etc., v. Rochester, 178 U. S. 373-384, which repeats the rule stated in Hearne v. Insurance Co., 20 Wall. 488, 490, that it must appear that both have done what neither intended. Plainly, the court may not reform an instrument where only one party executed it by mistake, for thereby the court would be setting up a contract which the other party had not made.
*499 The evidence falls far short of the clear, convincing, or satisfactory proof necessary to justify the court in reforming the written instrument. The rule is that in such a case the testimony should be clear and convincing. See Maxwell Land-grant case, 121 U. S. 325, 381. Adams v. Henderson, 168 U. S. 573, 579. In the preliminary negotiations looking to the procurement of the 8-M/M cartridges, urgently called for by General Pershing, which were had between certain officers of the Ordnance Office and the president of plaintiff company, the question of plaintiff’s compensation was considered. The price per thousand for the cartridges, subject to fluctuations, was agreed upon and this price did not include the cost of the change in machinery that would be necessary to transform it from the .30-caliber on which it was employed to the 8-M/M cartridges, but how that expense would be compensated for was not settled or agreed upon at any time. Major Holcombe thought it would be taken care of under the terms of the cost-plus proflt clause of the existing contract for the .30-caliber cartridges. Colonel Eames thought it could not be provided in a special-price contract, and all, including plaintiff’s president, concur that the details as to the basis or method of compensation were never settled.
These officers were not authorized to make contracts binding upon the Government and it was not until the letter of December 10, 1917, signed by General Crozier, Chief of Ordnance, and addressed to plaintiff, that the latter was authorized to proceed with the necessary preparations for and the manufacture of the 8-M/M cartridges. The “ acceptance of this order ” by wire was requested, and plaintiff did proceed with the necessary preparations. The terms stated in this letter had been arrived at in conferences before its date, between Colonel Eames, assisted by Captain Clark and by Captain Holcombe with Mr. Olin, president of plaintiff. The details were left to be worked out later and the only way in which these details were worked out is as shown in the written contract. The letter of December 10 states that a formal contract would be prepared and forwarded and two or more drafts of it passed between the parties and *500 were changed, in one or more features, before the final draft was executed. This at least shows that the final draft — the executed contract — was not a mere formal proceeding.
The letter of December 10 also stated it was understood that if pending orders and contract with plaintiff for .30-caliber cartridges were placed on a cost-plus basis of payment then the contract for the 8-M/M cartridges would be placed upon the same basis. And notwithstanding it had at that time cost-plus profit contracts involving approximately 179,000,000 .30-caliber cartridges, it does not appear that at any time the plaintiff objected to the written contract, or any provision in it, upon the ground that it was not a cost-plus profit contract. The facts show that the policy of making cost-plus profit contracts was being questioned in the latter part of December and that in January a reorganization occurred in the Ordnance Office resulting in the appointment of Colonel McRoberts as contracting officer, and that he did not favor cost-plus contracts. It does not appear in evidence that plaintiff’s officers ever asked that the written contract include the compensation it now claims. After it had received, considered, and suggested changes in one of the drafts sent to it, the plaintiff received at its office for execution the copies of the instrument as finally prepared. These were transmitted on or about March 5. The secretary of the company received them, placed his name on them as such, and affixed the company’s seal. He then returned them to Washington, probably to the Ordnance Office. What consideration he gave to the contract is uncertain, but on March 14 he wrote to the company’s president about some proposed changes in the contract. What these were does not appear. Nor does the exact date of the execution of the contract by the plaintiff’s president appear. He signed it in the office of Captain Black, who was connected with the contracting officer’s department and signed it for Colonel McRoberts, the contracting officer.
The'contract as signed carries the basic price of $47.50 per thousand cartridges, subject to adjustment according to fluctuations in copper, spelter, and powder, as stated in the letter of December 10, and subject, further, to changes *501 in the price as affected by labor costs above or below stated wages and the cost of completed bullets at $15 per thousand f. o. b. East Alton, Ill. Instead of the rental of a plant mentioned in the letter of December 10, the Government purchased a large plant at Kansas City, removed it to St. Louis at its own expense, and turned it over to the plaintiff for the purposes of this contract, without charge therefor. The sheet 3 (b) in the contract, being the second paragraph in section I, provides that plaintiff shall make the necessary changes in the arrangement of its plant to accommodate so much of this additional machinery as it utilized and to adapt the same to the purposes of the contract, and, further, to replace it at the termination of the contract in condition for the manufacture of .30-caliber ball cartridges “ without cost to the United States.” These provisions in sheet 3 (5) are not objected to. What is objected to are the six italicized words mentioned, which requires plaintiff to adapt its own plant, machinery, and tools to the purposes of the manufacture of 8-M/M cartridges — the very things it undertook by its contract to make. We have referred to the vagueness of the testimony as to what plaintiff’s officers understood about the contents of the contract. It called for large expenditures, aggregating approximately four millions of dollars. It bears internal evidence of careful preparation. It gives notice in terms that certain changes in the written form were made. The very sheet upon which the names of the contracting parties are signed stated that changes had been made before execution, and among them in mentioned paragraphs 1 and 8 “ on pages 3 (a) and 3 (&).” There is no term in the letter of December 10 that, in addition to the price mentioned for the cartridges, the Government would pay the direct cost of transforming the machinery, and there are substantial changes in the written contract from the undertakings expressed or implied in this letter. The added expense of furnishing machinery free of charge to plaintiff, as well as the benefits accruing to it from the use of this machinery and from other provisions of the written contract, would furnish sufficient consideration for the omission of a provision looking to reimbursement for the ex *502 penses now claimed, even if, in the first instance, there had been an agreement by authorized agents that such reimbursement would be made. The president of plaintiff says he did not read it, and when asked what was his mental attitude in regard to its identity of terms he said he thought the contract was similar to or a copy of what he had previously been over. But, as already suggested, the copy he had previously been over did not contain other parts of sheet 3 (5) that are not now objected to, and those parts were also absent from the former draft. At whose instance were these inserted? A few weeks before the signing of it he had asked Major Holcombe about the contract and was told by that officer that he had nothing further to do with its preparation. To say the least, the company’s officers were careless. If, however, it could be said that plaintiff’s officers executed the contract through mistake, where is the evidence that the mistake was mutual? There is no evidence as to who actually prepared, or directed the preparation, of the contract, or who settled or agreed upon its terms for the United States. Presumably it was the contracting officer, Colonel McRoberts, whose name was signed to the instrument by Captain Black, and, being dead, Colonel McBoberts could not be called to testify. Nor was Captain Black called to testify, the parties contenting themselves with a stipulation to the effect that this officer, Captain Black, would testify to the same effect as is expressed in his letter to plaintiff’s attorney, under date of August 16, 1921, when, replying to the attorney’s letter, he said that as he handled none of the details in connection with the contract he feared he could “ not be of assistance * * * in substantiating the claim,” and in his letter of a later date to the president of plaintiff company, in which he again disclaims any recollection of the details, stating as a reason that the negotiations were carried on prior to January 15, 1918, at which time he went to Washington.
The officer is plainly mistaken in his suggestion if he means that all negotiations were concluded prior to January 15. The contract was signed by him for Colonel McBoberts about two months after that date. Captain Black’s name also appears on three of the supplemental contracts. *503 Whether if all these papers had been submitted to Captain Black, they may have enabled him to recall any of the incidents of the preparation or execution of the contract, we can only surmise.
Major Holcombe, who was in the office of the contracting officer who preceded Colonel McRoberts, was examined and disclaims any knowledge of the preparation of the contract. He admits forwarding the final drafts of it to the plaintiff’s factory in a letter signed by him for Major Hamilton on March 5, but this was done as a more or less formal matter by him without knowing the terms or details of the contract. In these circumstances, where is there any basis for the claim that the contract was executed under mutual mistake ? Certainly it does not appear that any responsible agent of the Government prepared or directed its preparation or executed it under mistake as to any of its terms. Four supplemental contracts were executed in the following few months making some one or more changes in the original, and each of them declared that the latter was to continue in all its terms except as altered by the supplements. In addition it is difficult to understand how the mere elimination of the six italicized words would authorize the introduction of parole evidence in view of the well-settled rule upon the subject which is stated in Seitz v. Brewers’ Refrigerating Co., 141 U. S. 510, 511, as follows:
“ Undoubtedly the existence of a separate oral agreement as to any matter on which a written contract is silent, and which is not inconsistent with its terms, may be proven by parol, if under the circumstances of the particular case it may properly be inferred that the parties did not intend the written paper to be a complete and final statement of the whole of the transaction between them. But such an agreement must not only be collateral, but must relate to a subject distinct from that to which the written contract applies; that is, it must not be so closely connected with the principal transaction as to form part and parcel of it. And when the writing itself upon its face is couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, were reduced to writing.”
*504 It certainly comports with ordinary business transactions to say that when a manufacturer undertakes to deliver articles at a stated compensation the expense of adapting his machinery to the manufacture of those articles is so closely connected with it as to be included in the price stated. And it is an unusual proposition that a maker of one kind of cartridges shall undertake to make a distinctly different kind involving changes of his tools and dies or rearrangement of machines for a price per thousand specifically stated and then be entitled to further reimbursement because of these changes when the contract is silent upon that score. Its brief states that “ plaintiff asks no reformation by inserting in this contract the provision that the Government should pay these costs,” and frankly admits there was no reason why it should not have been inserted. But if it was a material part of the agreement for the making and delivery of the 8-M/M cartridges it should have found its place in the written instrument.
Our conclusion is that the petition should be dismissed. And it is so ordered.
Graham, Judge; Hat, Judge; DowNey, Judge; and Booth, Judge, concur.