Booth, Ohief Justice,
delivered the opinion of the court:
The plaintiff, Chicago & North Western Eailway Company, alleges two causes of action in its petition. The first is for the recovery of freight charges, said to be due under the decision of this court in the case of Missouri Pacific Railroad Co. v. United States, 56 C.Cls. 341. The facts bring the contention within the Missouri Pacific case in so far as the service rendered is characterized therein, but the date of rendition of the service precludes a recovery because of the statute of limitations.
On March 12, 1917, the plaintiff, together with connecting lines, transported a shipment of Government property from Fort Bliss, Texas, to Fort Sheridan, Illinois. The shipment was made up of 5 carloads of miscellaneous property, 7 carloads of escort wagons, and 5 carloads of horses. It was accomplished and the property delivered to the defendant on March 15,1917. The Auditor for the War Department made certain deductions from the bill rendered, the matter finally reaching the Comptroller General, who refused to sustain the plaintiff’s contention. Following the decision of this court in the Missouri Pacific case (supra), the plaintiff renewed its effort to have the claim allowed in accord with this decision, and was again unsuccessful. The petition herein was not filed until June 30, 1924, more than six years after the claim accrued, and, as held in the case of the Southern Pacific Company v. United States, 67 C. Cls. 414, is clearly barred by limitation.
The second cause of action is more involved. The single issue, conceded by the parties, is the reformation of an ex *534 press contract. The jurisdiction of the court is not questioned. Cramp case, 239 U. S. 221, 231; Milliken Imprinting Co. case, 202 U. S. 168; South Boston Iron Worhs case, 34 C. Cls. 174; Western Cartridge Co. case, 61 C. Cls. 482. Two substantial and familiar rules of law prevail. The mistake, to warrant reformation, must be a mutual one, and the evidence must be clear and convincing that both parties did not intend what the contract expresses. Maxwell Land-Grant case, 121 U. S. 325, 381.
Admiral W. A. Moffett, then a captain in the United States Navy, was in July, 1917, commandant at the United States Naval Station, Great Lakes, Illinois. At this particular time war activities at the station were extremely extensive- and acute. The construction of buildings was pressing and important. Large numbers of workmen were employed thereon under various contractors. In the course of the adopted programme it became imperative to at once lay certain trackage and construct a viaduct in connection therewith to enter the station. Captain Moffett procured from R. H. Aishton, the president of the plaintiff company, an oral agreement to at once perform this service upon a cost-plus-ten-per-cent basis, it being fully understood that the agreement would be later reduced to writing. The Great Lakes Station afforded no facilities for housing laborers and no source of supply. Labor had to be imported from Chicago and environs, and obviously had to be transported to and from the station. The plaintiff proceeded at once without the slightest delay to do what it promised to do and completed the work expeditiously and to the entire satisfaction of all parties involved. The written contract signed by the president of the plaintiff company on August 31, 1917, was by its terms to be effective as and of the date August 1, 1917, and embodied the oral understanding previously existing between the parties, except as to the clause in controversy here. This clause reads as follows:
“ (c) Transportation to and from the site of -the necessary skilled men for the economical and efficient prosecution of the work. The necessity for such transportation shall be determined by the officer in charge; such transportation shall, not involve repeated travel.”
*535 This clause appears in an addendum, identified as #1, to the general provisions of the contract, forming a part of the specifications for public works. The addendum on its face indicates its preparation to cover generally cost-plus contracts, irrespective of the particular work in hand, and prepared as a general provision long in advance of the contract to be subsequently made. The contract was formally signed by the Acting Secretary of the Navy and upon the part of the plaintiff by the president of the railway company. It nowhere appears that the Assistant Secretary of the Navy knew or did not know what the contract contained, and the plaintiff’s president executed it as an office routine, after it had been presented to him by others to sign. It is important, however, to take into consideration the events which antedated the execution of the contract, and arrive at what was the mutual understanding and intended agreement as to this stipulation. The contract was not signed until after the original work was completed. Therefore, it is vital to ascertain what was agreed upon and understood by the parties to be later reduced to writing. On July 9, 1918, a representative of the plaintiff attended a conference in Washington made up of naval officers, among whom was the Chief of the Bureau of Yards and Docks, and Captain George A. McKay, the latter becoming in a few days the public-works officer at the Great Lakes Station. The subject-matter of the conference was construction work at the Great Lakes Station and representatives of other contractors besides the plaintiff were present. The question of an allowance as a cost item, of the transportation of labor to and from the station daily was discussed, and the plaintiff’s representative was under the impression that it had been agreed upon, and the item was to be allowed as cost of work. That his impression was well founded and correct is corroborated by the allowance to other contractors of the item as cost of work, and by the advice of Captain McKay, then public-works officer, that he was duly authorized to allow the item. Again, on July 28, 1917, while this plaintiff and other contractors were performing their contracts, the public-works officer at the station forwarded an express recommendation to the commandant *536 (Finding IX), specifically pointing out and directing attention to the provisions of the contract to be signed, wherein under paragraph 3 (c) repeated travel as a cost item would not be allowed. This letter we set out in Finding IX. It unmistakably discloses the labor situation at the Great Lakes Station, and brings to the attention of the officials concerned in expediting the work the impossibility of accomplishing what has to be done in other manner than treating as a cost item the daily transportation of labor to and from the station. Changes were made in the contract upon the recommendation of the public-wdrks officer that affected stipulations in addendum #1, but paragraph 3 (c), the one here involved, was not changed. Nevertheless, the formal award of the contract to the plaintiff, made on August 9, 1917, was expressly stated as made upon the basis of plaintiff’s estimated cost of the work, which estimate included as a part of the cost the stated- expense of repeated transportation of labor to and from the station daily. During the progress of the work the plaintiff kept a complete record of repeated travel; this record was carefully checked by the public-works officer, approved and without questioning paid by the defendant upon the execution of receipts by the plaintiff. No charge is made that any single item of the claim is excessive or unreasonable, that the service was not furnished or in any respects unnecessary. It is likewise conceded that other contractors were allowed and paid repeated travel costs as part of the cost of doing the work. No prohibitive stipulation was inserted in their contracts, or invoked against them.
Without going further into detail it is sufficient, to observe that both in the field and in Washington the subordinate and contracting officials intended to agree that repeated travel should be allowed as an item of cost of performing the work. The findings, carefully deduced from the record, unfold a situation that not only discloses the equity of such an agreement, but positively point out that contracts to perform the required work could not have been obtained under any other conditions. There was no other alternative, for labor was not available at the station, and no quarters existed to house or feed men at the station. No doubt exists that; *537 every official of the plaintiff having to do with the contract honestly believed a provision in the contract provided for this situation, and beyond disputation the officers of the defendant entertained a like opinion. That such was the real agreement seems to us to be established.
The defendant, combating a conclusion such as we have reached urges the fact that the plaintiff, a railway company, was possessed of the means of transportation and therefore was to be discriminated against in this respect. The apparent weakness of the contention is the proven fact that the plaintiff did not maintain á service on its line for this: purpose, and in order to meet the emergency existing provided a special service for the transportation of its own and other contractors’ labor, a service which involved additional expense and the employment of special equipment. If the case is to be determined by actual knowledge of the agreement upon the part of the Assistant Secretary of the Navy and his individual assent being given to the contract upon the single condition that repeated travel of laborers was not to be considered a part of the cost of performance, then manifestly the plaintiff must fail, for the record is silent in this respect. The course of procedure leading up to the execution of the written contract, an instrument following the completion of all the original undertaking of the parties, is convincing evidence that what the Assistant Secretary intended to do was to carry into legal form what the subordinates in the department had agreed upon. The Bureau of Yards and Docks was the authoritative bureau of the department in immediate charge of the work and the negotiations and letting of contracts. This bureau and its officials were in contact with the situation and the details of the same were repeatedly referred to the bureau by the officials, in the field and on the premises. This was the adopted and pursued course of procedure, and there is nothing in the record that indicates in any way that the Assistant Secretary was doing anything more than approving in a formal way precisely what had been previously agreed to and it is in the Bureau of Yards and Docks that the terms of contracts like the one involved herein are settled. As said in the case of Ackerlind v. United States, 240 U. S. 531, 534, “ The *538 contract is made with the principal and the several steps are to' be regarded as if they all had been taken by him. Here the United States made the contract by the Bureau of Equipment and by its mouth requested the Bureau of Supplies and Accounts to put it on paper and sign it. What the Bureau of Supplies and Accounts understood is immaterial, it simply followed the requisition of the Bureau of Equipment. There was a mistake made by a clerk in not striking out a printed clause from that requisition. It is as if a principal after making the agreement had taken a printed form and forgotten to draw his pen through the words. The failure of the contractor to read before signing an instrument the terms of which he had seen in print is not enough to debar him from seeking relief. Equitable Safety Ins. Co. v. Hearne, 20 Wall. 494.” In the case of United States Cartridge Co. v. United States, 62 C. Cls. 214, 230, the court said:
“ It was primarily not its fault that the clause was not in the contract as submitted to it for execution and if such a rule were to be invoked in all cases so that relief was to be denied on the ground that failure to discover an error constituted such negligence as precluded relief, it is diíñcult to see how there could ever be a case in which such relief might be granted, for if errors were always to be discovered before the execution of contracts it would seem that there could be no errors for correction.”
The authorities, too many to cite, uniformly sustain the principle that the gravamen of the investigation is the ascertainment of the real agreement, the terms and conditions mutually assented to, and when so ascertained give effect thereto in cases where the failure to express them in the written contract is convincingly established. The proof herein we think meets the requirements of the rule. When the parties charged with the responsibility of negotiating contracts, in fact complete one, and are thereafter responsible for its performance, treat a particular service performed as one to be paid for it is one element of proof, most convincing. If, following the above proceeding, estimates of the cost of the service are made and certified to the bureau charged with knowledge of the contract and clothed with authority to approve or disapprove payments, and approved and paid *539 without protest for the service now in dispute, such conduct, treatment, and construction of the contract fortifies the belief that the parties agreed and intended to pay for the service from the beginning. In this case there is no positive evidence on the part of the defendant that the written contract expressed the agreement of the parties; as a matter of fact, the defendant’s officers thought payment for the service was included in the contract, and acted in accord with the same.
We think the contract should be reformed, and the plaintiff awarded a judgment for $3,316.31. It is so ordered.
Wilt,tams, Judge, and Littleton, Judge, did not hear and took no part in the decision of this case.
Greek, Judge, and Graham, Judge, concur.