24 P.(2d) 718

## FRANCISCAN HOTEL CO. v. ALBUQUERQUE HOTEL CO.

No. 3714.

Supreme Court of New Mexico.

June 17, 1933.

Rehearing Denied Aug. 28, 1933.

Merritt C. Mechem and Bryan G. Johnson, both of Albuquerque, for appellant.

Fred E. Wilson, of Albuquerque, for appellee.

HUDSPETH, Justice.

By a lease of indenture dated April 17, 1923, the site of the Franciscan Hotel, in Albuquerque, was demised to the plaintiff for a period of fifteen years, at a nominal rental for the first eighteen months, at $1,150 per month for the next six months' period, at $1,816 per month for the next three years, etc., payable in advance on the 1st day of each and every month. The lessee covenanted (section 3) to pay, "in addition to such rent reserved, all property taxes, insurance, and other fixed charges" against the property. Paragraphs 3 and 4 of section 3 provide:

"It being further understood and agreed that in the event the sub-lets, and the rental of the 'Coffee Shop' at One Hundred and Fifty Dollars ($150.00) per month, do not equal the taxes, insurance and outside building upkeep, the lessor will and does guarantee that it will assume such excess, but upon the further undertaking that settlement of and for such difference between sub-let income, including a rental for the Coffee Shop at One Hundred and Fifty Dollars ($150.00) per month, from and after March 1, 1925 (which rental is included in and made a part of the rental consideration herein stipulated and set out), shall be made at the expiration of each five year period, during the term of this lease.

"It is furthermore agreed that lessee before closing any lease in connection with 'sub-lets', will advise the President of lessor corporation in writing of terms of rent of such lease, and that lessor shall have the privilege of furnishing any other tenant, for a business not competitive or objectionable, who will pay a higher rental. The term 'sub-lets' is understood to refer to and include all store rooms fronting on Central Avenue and Sixth Street, other than the room referred to as the 'Coffee Shop.' "

At the expiration of the first five-year period, on January 1, 1929, it was found that the lessee had expended $20,986.40 for taxes on the premises, $4,583.12 for insurance of the premises, and $848.15 on outside upkeep of the building, thus making its total expenditures $26,417.67. Lessee had collected as rent from sublets, excluding the Coffee Shop, $11,114.25. The total rental for the Coffee Shop for this period, at $150 per month, amounted to $6,900.

Is the lessee, in the first five-year settlement of differences, entitled to $15,303.42, the difference between $26,417.67 and $11,114.25, or should an additional $6,900 be deducted from this difference, thus entitling plaintiff lessee to only $8,303.42? That is the principal question upon which the parties to this proceeding disagree.

In its action for an accounting, plaintiff (lessee) alleged in its first amended complaint that the real agreement between the parties was that the lessee was to pay each month to the lessor $150 per month for the Coffee Shop, and that it was not to credit the lessor with the amount of its rental in the five-year settlement of differences; that, through a mutual mistake of the parties and through the mistake of the scrivener who reduced their actual agreement to writing, section 3 of the lease failed to express the real understanding of the parties. The prayer for relief, which was in the alternative form, was that section 3 be reformed "so as to express the actual agreement had between the parties," and that an accounting be had, based upon the terms of the contract as reformed, or, in the event that the court should determine that plaintiff was not entitled to reformation, nevertheless that plaintiff be awarded the same amount in an accounting "under the terms of the contract as written."

The trial court gave judgment for the plaintiff in the amount of $15,303.42, and ordered paragraph 3 of section 3 to be reformed so as to read: "It being further understood and agreed that in the event the sub-lets do not equal the taxes, insurance and outside building upkeep, the lessor will and does guarantee that it will assume such excess, but upon the further understanding that settlement of and for such difference between sub-let income, excluding a rental for the Coffee Shop at one hundred and fifty dollars ($150.00) per month, from and after March 1, 1925 (which rental is included in and made a part of the rental consideration herein stipulated and set out), shall be made at the expiration of each five-year period, during the term of this lease."

From this judgment and decree of reformation, lessor appellant prosecutes an appeal to this court.

We shall first consider appellant's contention that the trial court erred in sustaining plaintiff's demurrer to the first defense contained in defendant's original answer.

In its first defense defendant alleged that, in a former suit between the same parties involving the same lease, plaintiff had, as a first cause of action stated in its complaint, declared upon the lease as it is written and had demanded an accounting thereunder; as a second cause of action, plaintiff had alleged a mutual mistake in reducing the agreement of leasing to writing and had prayed for a reformation of section 3 of the lease and an accounting under the lease as reformed; that in said former suit plaintiff had, on defendant's motion, been ordered to elect on which cause of action it would proceed, and had elected to proceed under the lease as written; that subsequently, and before defendant had answered, plaintiff had voluntarily dismissed said suit and begun the present action. To this defense plaintiff demurred, and the trial court sustained the demurrer.

It is appellant's contention that the plaintiff, in signifying its intention, when ordered to elect between the two causes of action set out in its complaint, to proceed upon the first cause of action, made a deliberate and conclusive election of remedies which bars it from seeking, in the present suit, a reformation of the lease. This contention we think to be without merit.

The doctrine of election of remedies, which is based upon principles of estoppel, is thus concisely stated in Henderson Tire & Rubber Co. v. Gregory (C. C. A.) 16 F.(2d) 589, 593, 49 A. L. R. 1510, to be as follows: "The doctrine stated in its simplest form means that, if a party has two inconsistent existing remedies on his cause of action and makes choice of one, he is precluded from thereafter pursuing the other."

It is generally held that the bringing of an action at law upon a contract, which action does not proceed to a final determination upon the merits, is no bar to a subsequent suit to reform the contract and recover upon the contract as reformed. In Hillerich v. Franklin Ins. Co., 111 Ky. 255, 63 S. W. 592, 593, it was said: "The question, and the sole question is, whether the mere assertion of a claim upon the ground that it is covered and included in a contract as written is so inconsistent with a claim that the contract be so reformed as to include and cover such relief as to make it a conclusive election of the remedy, and bar the plaintiff of any right to seek relief upon the ground of mistake in the drawing of the written contract. We think the weight of authority is against the conclusiveness of the election." See also, Segerstrom v. Holland Piano Mf'g. Co., 155 Minn. 50, 192 N. W. 191; Silber v. Gale, 38 Ohio App. 248, 175 N. E. 886; Spurr v. Home Insurance Co., 40 Minn. 424, 42 N. W. 206; Taylor v. Glens Falls Insurance

Co., 44 Fla. 273, 32 So. 887; note, 49 A. L. R. 1514, and cases therein cited.

We see no reason, in principle or of policy, for giving greater finality to plaintiff's involuntary election to proceed upon the contract as written than is ordinarily given to the bringing in the first instance of an action upon a contract as written.

Our Code (Comp. St. 1929, § 105-406) permits the joinder of several causes of action in a complaint, both legal and equitable. Porter v. Alamocitos Land & Livestock Co., 32 N. M. 344, 256 P. 179. And, under our practice, when a plaintiff is in doubt as to his relief, he has the right to set forth his claim in several counts so as to meet the facts which are established on the trial. Ross v. Carr, 15 N. M. 17, 103 P. 307. In the case at bar, plaintiff could not be certain, in advance of trial, just what form the proof would take, and therefore what was the proper theory of relief. On the theory that the contract as written was not clear and unambiguous on its face, and that extrinsic evidence was admissible to explain the ambiguity, the court might, in the light of such extrinsic evidence, construe the written contract as plaintiff contends the actual agreement of the parties to have been. But, if the contract as written should, in the opinion of the court, be unambiguous and incapable of such construction, and if the proof should demonstrate that a mutual mistake had been made in reducing the actual agreement of the parties to writing, plaintiff's remedy would be reformation of the written contract under which an accounting was sought. The two counts were properly joined, and plaintiff should not have been required to elect, in advance of trial, upon which count it would proceed. However, our Code does not give an appeal from an order to elect (section 105-2502, New Mexico Statutes, 1929 Compilation); and the overruling and sustaining of a motion to elect is largely in the discretion of the trial court. Ross v. Carr, 15 N. M. 17, 103 P. 307. Such having been the circumstances, we fail to see how the action of the plaintiff in its former and subsequently abandoned suit, by which, incidentally, defendant makes no claim to have been misled or prejudiced, can be invoked to raise an estoppel. The trial court's ruling sustaining the demurrer to the first defense contained in defendant's original answer will therefore be affirmed.

This leads us to a consideration of the other points relied upon by appellant for reversal. Most of these are directed to the proposition that plaintiff was not, as a matter of technical law, entitled to a reformation of section 3 of the lease.

In our discussion of the correctness of the court's ruling on plaintiff's demurrer, we have, for purposes of sharper analysis of appellant's contention, assumed that a claim of a right to reformation is the sole basis stated in the first amended complaint in this action for the amount of the judgment asked. It should be noted, however, that such is not the case, as the prayer for relief clearly demonstrates. In Porter v. Alamocitos Land

& Livestock Co., 32 N. M. 344, 256 P. 179, 185, we pointed out that: "It is sometimes said that the prayer is no part of the cause of action stated by the complaint. While that may be true, it is evident that the prayer may be considered in determining the character of relief sought, and it at least expresses the theory of the plaintiff as to the kinds of relief he is entitled to under the cause or causes of action stated in his complaint."

Though the complaint in the present action is differently framed, it is, in substance, identical with that filed in plaintiff's former action, and it sets out, perhaps a little informally, exactly the same causes of action. Therefore, even if plaintiff was not, as a matter of law, entitled to have section 3 of the lease reformed, we are of the opinion that the money judgment awarded by the trial court must stand if it is warranted by the terms of "the contract as written." For, though the judgment awarded was rendered primarily on the theory of mistake warranting reformation, the findings of the court do not reject the other theory.

It is a principle of law too familiar to require citation of authority that, if a contract is clear and unambiguous on its face, parol evidence will not be permitted to vary or modify its terms. It is equally clear, however, that, if the meaning of a written contract is not clear, parol testimony may be used to aid in its interpretation. As this court, speaking through Justice Roberts, said in the case of Hill v. Hart, 23 N. M. 226, 232,

167 P. 710, 711: "It is well settled that, where the terms of a contract are obscure and uncertain, evidence of antecedent negotiations and of the facts and circumstances surrounding the parties is admissible to enable the court to put itself in the place of the parties to the contract and to view it as they viewed it."

Applying these principles in the case at bar, we have first to inquire whether or not section 3 of the lease as written is so clear as to be capable of only one construction.

The trial court was of the opinion that:

"In order to clearly understand what was in the minds of the parties, it would almost necessitate, in fact I think it would entirely necessitate and require the aid of something other than the mere paper before the Court —the contract before the Court. * * *

"With reference to the language in Section 3 of this lease, beginning with the words 'It being further understood,' which are the first words in the third paragraph of that section, if that wording, with what it relates to otherwise expressed in that section, were an absolutely independent contract, then, in the Court's opinion, the meaning of the said third paragraph of said section, together with the fourth paragraph of said section, would be that a contract had been made with the understanding that the lessee was to pay taxes, insurance, etc., and at the end of each five year period, between the parties, a settlement was to be made, and that at the time of that settlement, and in contemplation of the idea that under such conditions the

lessor would account to the lessee for any excess, the Coffee Shop, for the purpose of that settlement, should be taken and considered as having been rented at the rate of $150.00 a month. * * *

"However, it is of course manifest that Section 3, within itself, is not an independent contract, nor intended as such, because surely under the first part of Section 3, property taxes, insurance, etc., to be paid by the lessee did not have reference merely to these so-called sub-lets and Coffee Shop. They had reference to the entire property; they had reference to the lots set forth in the early part of the contract, as well as all the fixtures, improvements and appurtenances thereunto appertaining, so that whatever is said in Section 3 must be considered in connection with the entire contract. If the entire contract were the only thing that the Court would have a right to look to, its attention would immediately be arrested to the fact that there is at least in the wording, if not a real, then an apparent inconsistency. In the early part of the lease, from its wording, what seems to be intended to be covered by the lease holding are the lots, together with everything thereto appertaining—that is to say, the rights, privileges, easements and appurtenances, which would of course include the fixtures and the building construction upon those lots. If an attempt were made to then consider the language in Section 3, it would seem as though there was a reservation, or an exception, from the real estate contemplated in the early part of the contract, and that as to said excepted parts that would have a status by itself. * * *

"As I said before, if we could change—of course we cannot—but if we could segregate this contract into two contracts—one of them to refer to the hotel property as a whole, and then the other to refer merely to these sub-lets and Coffee Shop, I think the wording in the brackets in Section 3 reading, 'Which rental is included in and made a part of the rental consideration herein stipulated and set out', would be clear to indicate what was in the minds of the parties. * * * But in view of the fact that Section 3 is only a part of the entire contract, the question would naturally arise as to whether or not the wording within those brackets were intended merely with reference to the general rental otherwise expressed in the contract. For instance, did it refer to the consideration of rental spoken of in Section 2? If it does have reference to the consideration otherwise expressed in the contract, then it would seem to mean that when the time of the accounting comes, the consideration of $150.00 for the Coffee Shop as a formula means then a part of the moneys which may have otherwise been paid in advance as required under Section 2. If it does not mean that, and refers solely to the wording in Section 3, that Section considered independent of the other parts of the contract, it would mean, it seems to me, that in addition to the rental consideration provided for in Section 2, at the time of the accounting the lessee, within the formula, would be required to stand for, and

be responsible for $150.00 per month additional. Incidentally, I understand this to be the position of the defendant in this case. But, as I said before, in order to determine the wording of any particular part of a contract, it must be contemplated with reference to the whole. * * * "

Appellant's position is that the third paragraph of section 3 is crystal clear, and that it can mean only one thing, thus concisely stated by Roslington, defendant's president, to be: "You (i. e., lessee) are to get a refund based upon the difference between the taxes, insurance and upkeep of the building and such rentals as you may actually collect from four sub-lets, and the arbitrary rental upon one room which you occupy—this Coffee Shop at $150.00 per month. * * * That refund is a calculation based upon a formula that is stated in the lease, and it is nothing else."

But we encounter somewhat the same difficulty in accepting this construction that the trial court experienced. And it is at least questionable whether we would not be entirely ignoring the significance of the clause in parenthesis contained in the third paragraph if we accepted appellant's construction.

By section 3, the lessee covenants that, in addition to paying the rent reserved, it will pay, as they accrue, certain items, such as property taxes, that are more properly expenses of the reversion and of the fee interest than of the nonfreehold term of years. The third paragraph of section 3 seems designed to (1) make clear that the payment of these items is to be merely an advance to the lessor; and to (2) point out the source from which the lessee will obtain the money with which to pay these items. That source is certain store rooms. What the income from four of these rooms is, or will be, is not known; at what figure each of these shall be rented is not stipulated; but, as to the fifth of these rooms, i. e., the Coffee Shop, it is stipulated what that shall be rented for, and it is known what the income from the rental of that room will be. As to the four rooms known as sublets, the lessee guarantees nothing, and the lessor is entitled to the benefit of, and bears the risk of, a fluctuating rental value as to them. As to the Coffee Shop, on the other hand, the lessee bears the risk of any fluctuations in its rental value. In other words, the lessee guarantees that the lessor can count on $150 per month for this room.

Now, for purposes of further analysis, let us assume that paragraph 3 read as it now reads, but that the clause in parenthesis, "which rental is included in and made a part of the rental consideration herein stipulated and set out," were omitted. Two things would then be clear: (1) Lessee would not account to the lessor for the $150 per month until the expiration of the five-year period; in other words, lessee would merely put $150 each month into the fund, as it were, which it was to draw upon in paying taxes, etc.; and (2) there would be no question but that, upon the accounting before us, $6,900 should be deducted from the difference between the taxes and other expenses of lessor

paid by lessee and the income received by lessee from the renting of the sublets.

What, then, is the significance of the clause in parenthesis? Is it a mere superfluity? It should be noted that appellant does not contend that it adds $150 a month to the monthly rental reserved in section 2; i. e., appellant does not contend that lessee is, under this lease as written, obliged to pay lessor $1,150 plus $150, or $1,300 each month, etc. Under appellant's construction of section 3, therefore, the clause in parenthesis would be entirely superfluous. But we cannot presume that clause was put into paragraph 3 for no purpose. In effect, that clause would seem to say: "Instead of putting that $150.00 per month into the fund out of which you advance taxes for us, we want you to pay it over direct to us each month, so we have included that amount in the monthly rental reserved in Section 2." Such construction does not necessarily do violence to the language in the rest of the paragraph. It accepts what the rest of the paragraph provides, but entitles the lessee to a bookkeeping credit, under the formula, for the amount paid over to the lessor for the Coffee Shop. It is, as it were, a "receipt for payment" by the lessor. In the light of the extrinsic testimony adduced in the case, we are inclined to believe such to be the more reasonable interpretation of the terms of paragraph 3 of section 3 of the lease as written.

The evidence indicates that in March, 1923, Grier, president and a director of the lessee corporation, began negotiating for a lease on the Franciscan Hotel. Negotiations were carried on with a committee of defendant's directors. According to the evidence adduced by plaintiff, including the testimony of Fisher, secretary of defendant corporation, and who was present at all the meetings held by the parties negotiating for lessor and lessee, a tentative agreement was, after much dickering, reached, whereby lessee was to lease the entire premises, at a nominal rental for the first eighteen months; at $1,000 per month for the next six months' period, from March 1, 1925, to August 31, 1925; at $1,666.66 per month for the next three years; and at a gradually increasing rental from then on. In addition, lessee was to pay the taxes, insurance, and outside building upkeep. Under the terms of this tentative lease, which was drafted by lessee's attorney, (1) the store rooms were not retained by the lessor; and (2) lessee agreed to pay the taxes, etc., without reimbursement. This tentative agreement did not, however, end negotiations. Lessor's representatives decided that they wanted to reserve the store rooms and have the lessor collect the income from these rooms. So the parties continued to dicker about the sublets. Finally, at a meeting of the board of directors of defendant corporation held on April 15, 1923, Grier submitted a proposition which, according to the minutes of that meeting, was as follows: "Mr. Grier proposed to take over rental of stores, pay the taxes, insurance and upkeep, and pay $150.00 per month for the coffee shop, this rental to begin March 1st, 1925, this corporation to assume any excess over sub-rental including Coffee Shop at $150.-

00 per month, and any losses to be settled at the end of five year periods during the term of lease."

The board voted to accept this proposition, and the attorneys for lessor and lessee were directed to draw up a lease. Fisher, who drafted and recorded the minute set out above, testified that, at the time Grier's proposition was accepted, it was not contemplated that he was to pay over each month to the lessor this $150 but that it was to be accounted for in the five-year settlements of differences; that afterwards, and before the final draft of the lease was submitted to the directors, it was decided that Grier should pay the $150 each month; that therefore $150 was added to the general monthly rental reserved for the premises in the tentative lease. There was other testimony to the same effect. Two days after this, on April 17, 1923, the board of directors of defendant corporation was presented with the lease as it is now written, and the board voted to authorize the president and secretary to sign it.

█ Appellant contends that the parol testimony of Fisher and others should not be permitted to contradict or vary the written record of the action taken by defendant's board of directors on April 15th. However, a careful perusal of the recorded proposal of Grier which was accepted at that meeting indicates that, though Grier agreed to take over the Coffee Shop at $150 per month, there is nothing to indicate that he proposed to pay it into the hands of the lessor each month.

In other words, though the proposal as recorded states the rate of payment, it is silent as to the time of payment. Therefore, even if we assume that the records and minutes of a private corporation are "written instruments," neither the parol evidence rule nor the best evidence rule prevent us from considering parol testimony "for the purpose of showing facts not recorded." Rueb v. Rehder, 24 N. M. 534, 174 P. 992, 994. The rule is well established that oral evidence is admissible to explain or supplement the recorded proceedings of meetings of directors. Rose v. Independent Chevra Kadisho, 215 Pa. 69, 64 A. 401; Indian Ref. Co. v. Buhrman (C. C. A.) 220 F. 426; Northland Produce Co. v. Stephens, 116 Minn. 23, 133 N. W. 93; Shuman v. Main, B. & B. C. M. F. Insurance Co., 265 Pa. 38, 108 A. 265. See, also, authorities cited in note, 66 A. L. R. 1337.

█ It would unduly lengthen this opinion to set out all the evidence as to the circumstances surrounding the execution of the lease which fortify our conviction that the proper interpretation to be given to the patently ambiguous paragraph of section 3 is that the rental for the Coffee Shop is included in the general monthly rental reserved in section 2, and that, having paid it each month, lessee is not obliged to credit lessor with its rental in the five-year accounting between the parties. We are therefore of the opinion that the trial court was correct in awarding to the lessee a money judgment for the difference between the total expenditures of lessee and the income collected by lessee

from "all store rooms fronting on Central Avenue and Sixth Street, other than the room referred to as the 'Coffee Shop.' "

However, was that part of the decree of the trial court which ordered reformation correct? The quantum of evidence necessary to establish a right to reformation on the ground of mutual mistake of the parties in reducing their agreement to writing is more than a mere preponderance. Dearborn v. Insurance Co., 17 N. M. 223 at page 232, 125 P. 606, states the rule to be that the proof must be of the clearest and most satisfactory character. According to Pomeroy, "The parol evidence of the mistake and of the alleged modification must be most clear and convincing. * * * Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of the evidence, but only upon a certainty of error.' 2 Pomeroy, Equity Jurisprudence (4th Ed.) § 859.

The record clearly indicates that, if the language of section 3 means what appellant claims it to mean, then it does not express the intention of the parties who negotiated the lease contract. The record likewise appears to convincingly indicate that there was a meeting of the minds of the parties who did the negotiating. Was this sufficient for plaintiff to show?

Of the eight members of defendant's board of directors who were present at and who voted at the meeting of April 17, 1923, two, Fisher and Breece, affirmatively testified that it was never their intention that lessee should pay for the Coffee Shop twice, and that they understood they were authorizing a lease under which lessee was not to account for its rental in the five-year accounting between the parties. This corroborated the understanding of Martin, one of the directors who was present at the meeting of April 15th, and who testified as to being somewhat familiar with the negotiations, but who was not present at the meeting of April 17th. Cox and Wylder, two other directors who were present at the meeting of April 17th, and who took the stand as defendant's witnesses, had no recollection of what they understood at the time they were authorizing.

There was not even a scintilla of evidence contradictory to the testimony of plaintiff's witnesses Hanna, Grier, Fisher, Martin, and Breece as to the circumstances leading up to the execution of the lease. Nor was there any evidence that any of defendant's directors understood the lease to mean that plaintiff was to pay $150 per month for the Coffee Shop and also account to the lessor for such amount in the five-year settlement of differences. Wylder's testimony, and that of Cox, if it indicates anything, would seem to indicate that the minds of those directors who were not active in negotiating the lease never adverted to the proposition, and that they probably merely gave the rubber stamp of their approval to what the committee negotiating the lease proposed.

The lease litigated is the only lease which the parties executed and signed, and the only lease which the board of directors of defend-

ant corporation authorized the president and secretary to sign. Appellant makes this fact the basis for two technical arguments that plaintiff has failed to establish by cogent proof a right to reformation of the lease on the ground of mutual mistake of the parties to the contract in reducing their agreement to writing.

In the first place, appellant argues: "The written contract of the parties cannot be reformed unless they had theretofore entered into a valid and enforceable contract sufficiently expressing the real intent of the parties which the written instrument when reformed will express."

But the existence of a prior enforceable contract is not a sine qua non to securing reformation. Wigmore points out that the assumption is fallacious, for: "written contracts are not necessarily preceded by oral ones; the moment of assent, and thus of the beginning of the obligation, to the terms as finally settled upon may be the moment of signature of the writing,—as in numerous negotiations by mail; and in such instances it is equally possible (though not common) for an erroneous term to be inserted in the draft at the last moment. The correction of erroneous instruments therefore does not rest necessarily upon any assumption that a prior completed oral contract is being enforced." Wigmore on Evidence (2d Ed.) § 2417.

Appellant's second argument is closely related to this proposition. Apparently, its assumption is that plaintiff was not entitled to reformation unless it affirmatively showed,

beyond a reasonable doubt, that a majority of the members of the board of directors of defendant corporation who voted to authorize the execution of the lease labored under the same mistaken belief that lessee's agent and that the directors of lessor corporation appointed to negotiate a lease for lessor labored under. To uphold this assumption would place upon a party seeking reformation of a contract entered into with a corporation a burden of proof which, in most instances, it would be impossible for the party to sustain. We are of the opinion that plaintiff's failure to prove the subjective state of mind of a majority of the members of the board coincided with that of lessee is not fatal to its right to obtain reformation, and that the doctrine enunciated by Mr. Justice Holmes in Ackerlind v. United States, 240 U. S. 531, 36 S. Ct. 438, 439, 60 L. Ed. 783, in answer to a contention somewhat similar to appellant's contention, is applicable here: "The contract is made with the principal and the several steps are to be regarded as if they all had been taken by him." See, also, Chicago & N. W. Ry. Co. v. U. S., 68 Ct. Cl. 524, at page 537.

Appellant contends, however, that, even if a mutual mistake was made, plaintiff has been guilty of laches in the assertion of its claim of mistake. It is, of course, a well-established equitable principle that a party may lose his right to have an erroneous instrument reformed if he fails to pursue his remedy within due time after the discovery of the mistake. Cleveland v. Bateman, 21 N.

M. 675, 688, 158 P. 648, Ann. Cas. 1918E, 1011. Whether or not the case at bar falls within this principle depends upon whether or not the trial court's finding of fact No. 15 is erroneous. That finding reads as follows: "The Court finds that plaintiff did not discover the failure of said contract to express the actual agreement of the parties with reference to the rental of the Coffee Shop by plaintiff and the accounting for the rental of said Coffee Shop at the end of each five-year period until after January 1, 1929, when negotiations began between plaintiff and defendant relative to an accounting at the end of the five-year period as provided in said contract; that the mistake resulting in a failure of said contract to express the actual agreement arrived at could not in the natural course of events have been discovered until an effort was made to apply the language used in the contract to an audit of the transactions with reference to the rental of the Coffee Shop, and to an adjustment and an accounting as provided in the contract; that until said effort was made and said negotiations began, after January 1, 1929, plaintiff did not know that the language of the contract could be construed so as to require it to pay $150.00 per month rental for the Coffee Shop at the time of the payment of the regular rental on the entire building, and also account to defendant for an additional $150.00 per month at the end of each five-year period, thereby in effect causing it to pay $300.00 per month for the use of the Coffee Shop; that it was not contemplated or understood by either plaintiff or defendant at the time said contract was executed that plaintiff should pay $300.00 per month for the use of the Coffee Shop, and that the claim that the contract so provided was not asserted by defendant until one George Roslington became President and Director of defendant corporation and the negotiations were in progress to effectuate an accounting under said contract for the first five-year period."

Appellant contends that this finding is contrary to the evidence, in that it disregards a series of correspondence between Grier and Roslington in July and November of 1925, relating, among other things, to the rental of the Coffee Shop. With this contention we are unable to agree. A careful examination of this correspondence, together with a consideration of the testimony of both Grier and Roslington, would seem to indicate that Grier was, in spite of the letters of Roslington, which stated in complex and technical fashion defendant's position, under a palpable misapprehension as to just what defendant's construction of section 3 was. Although, had the trial court held otherwise than it did, we would not disturb such finding, we are satisfied that the conclusion of the trial court is supported by substantial evidence, and must therefore be upheld. In view of this, it is unnecessary to consider appellant's contention that plaintiff was guilty of laches and that it was not, therefore, entitled to have section 3 reformed.

▮ Nor are we impressed with appellant's further contention that the trial court erred in refusing to find that the plaintiff had rati-

fied and affirmed the lease of April 17, 1923, in its contract of January 21, 1927, which, among other provisions, contained the following: "By this instrument it is not intended to alter or in any way change the present lease between Franciscan Hotel Company and Albuquerque Hotel Company, nor the rentals reserved therein, nor the right and duty of the parties thereto to take an accounting every five (5) years as provided in said lease on the question of sub-lets, taxes, insurance and other items mentioned in said lease, but it is agreed that no other item, claim or demand shall be included in said five year settlement than those specified in the lease, all other claims of Franciscan Hotel Company against Albuquerque Hotel Company being hereby terminated, settled and released."

At the time this contract was entered into, there was no controversy between plaintiff and defendant as to whether or not plaintiff should account for the Coffee Shop rental in the five-year accounting, in addition to paying the rent reserved for it each month. The purpose of the agreement, as appears from the face of the instrument itself, and from the testimony of plaintiff's manager, Murphy, was to settle certain controversies which had arisen between the parties as to the upkeep of the building and as to certain alleged defects in the physical condition of the building. That the matter now being litigated was not in the contemplation of the parties, nor within the scope of the matter contained in the agreement, is clear from the testimony of Judge Simms, who was president of the lessor corporation on January 21, 1927, and who actually drafted the agreement of that date:

"A. Well, I know I did not desire to make this adjustment of the physical condition of the building to be interwoven with the lease construction in any way; I wanted to get the building finished and delivered to the man like he was entitled to have, but I did not want these conditions to be read into the lease.

"Q. And this agreement was to settle all other questions? A. Governor, I did not know we were apart on anything. There may have been something on the files of the secretary, but I thought we had settled the questions we were apart on, and that we were together."

However, even if we assume that the scope of the agreement was as broad as appellant contends a literal construction of it demands, we are not inclined to feel that it constituted a ratification of anything other than "the instrument as intended and understood." See Barnard v. Gantz, 140 N. Y. 249, 35 N. E. 430. See, also, 53 C. J. 965. Plaintiff's right to now insist upon its construction of the lease, or to seek reformation of the lease so as to make it coincide with the intention of the parties, was not thereby lost.

There remains to consider appellant's seventh point relied upon for reversal. That point raises the question of whether lessee was entitled, in the accounting between the parties, to a credit for the payment of taxes on the premises for the first half year of 1928.

Section 3 of the lease provides that "all such property taxes shall be paid by the lessee before they become delinquent, and lessee shall furnish the lessor with receipts showing such payment." On December 31, 1928, lessee mailed a check for $2,669.68, the amount of the property taxes for the first half-year of 1928, to the treasurer of Bernalillo county; this check was received by the treasurer on January 1, 1929, and a tax receipt therefor issued by the treasurer under date of January 11, 1929. This check was paid to the treasurer by the bank on which it was drawn on January 14, 1929.

Taxes for the first half year of 1928 were due and payable December 1, 1928. Section 141-414, New Mexico Statutes, 1929 Compilation. By an order of the district court of Bernalillo county dated November 14, 1928, the time for the payment of taxes was extended from December 1, 1928, to January 1, 1929. This order cannot be invoked, however, in aid of lessee's contention that the taxes were paid before they became delinquent. For, as we recently held in State v. Fifth Judicial District Court, 36 N. M. 151, 9 P.(2d) 691, the judicial department of the state government has no power to extend the time fixed by the Legislature for the payment of taxes, or to postpone the delinquent date designated in the statute, from which date interest or penalty is computed. But we cannot accept appellant's contention that one of the legal consequences of the failure of lessee to pay the taxes "before they became delinquent" is that he is deprived of the right to include them in the five-year accounting under the lease. To accept appellant's construction of the lease would be tantamount to holding that the right to an accounting for taxes paid depended, not upon the fact of payment of the taxes by lessee, but upon the fact of payment of them before delinquency. And it would logically follow from such construction that lessor would be relieved of the duty of reimbursing lessee for this item of $2,669.68 not only at the time of this accounting, but also in subsequent accountings between the parties.

The sounder construction of this provision of the lease we believe to be that lessee is entitled to a credit for all payments of taxes, insurance, etc., actually made during the five-year accounting period. The provision for *payment of taxes before delinquency would* appear designed merely to prevent the lessor from suffering any penalties or other injury on account of the nonpayment of taxes before delinquency. There is no showing that the lessor suffered any such here. If he had, he would probably be entitled to his damages for breach of covenant. We therefore hold that, for purposes of accounting between the parties, it is immaterial whether the taxes for the first half year of 1928 were paid before or after delinquency. The only important question is, Were the taxes paid before the beginning of the second five-year accounting period, which began January 1, 1929?

██ We think that, within the terms of the contract, they were paid on December 31, 1928, when lessee mailed his check, subsequently cashed upon presentment to the

drawee bank. The delivery of a check does not, ordinarily, per se, constitute payment in a legal sense. 3 Williston on Contracts, § 1922. However if, when the check is delivered, the drawer has funds in the drawee bank to meet it, and if the check is, upon presentment, honored and paid, as was the situation in the instant case, payment will be deemed to have been made as of the time of the delivery of the check. See Hunter v. Wetsell, 84 N. Y. 549, 38 Am. Rep. 544; Burstein v. Sullivan, 134 App. Div. 623, 119 N. Y. S. 317; Langridge v. Dauenhauer, 120 La. 450, 45 So. 387; 21 R. C. L. p. 70. We are therefore of the opinion that the trial court correctly allowed lessee to include the item for the taxes for the first half year of 1928 in this accounting.

Finding no error in the record, the judgment of the lower court will be affirmed. It is so ordered.

SADLER, BICKLEY, and ZINN, JJ., concur.

WATSÓN, Chief Justice (dissenting).

I have maintained the view that the contract is unambiguous. I have been overruled but not converted. To argue the matter here would serve no useful purpose. I therefore merely withhold approval of the opinion as to that point.

Of course an unambiguous contract may be reformed to correct a mutual mistake. Whether the ambiguity of the contract has influenced the majority decision that it was properly reformed, I do not know. Whether, considering the contract to be unambiguous, the evidence warrants its reformation, I have reached no conclusion, deeming it unnecessary under the circumstances.