268 P.2d 339

**ARMIJO**

v.

**NATIONAL SURETY CORP. et al.**

No. 5555.

Supreme Court of New Mexico.

Feb. 11, 1954.

Rehearing Denied April 8, 1954.

168

Owen B. Marron, Alfred H. McRae, Albuquerque, for National Surety Corp.

Harry L. Bigbee, Donnan Stephenson, Santa Fe, for appellee.

SADLER, Justice.

The plaintiff recovered a money judgment in the District Court of Santa Fe County against defendant, National Surety Corporation, and its co-defendant, Hardy D. Moore, in the sum of $15,203.68. The building contract out of which the cause or causes of action sued upon arose was let on a low bid of $18,448.40. Both defendants appealed but the appeal of Hardy D. Moore was subsequently dismissed because not seasonably granted. Thus it is that we have before us only the two parties, the plaintiff below who is the appellee here and the defendant, National Surety Corporation, which feeling itself aggrieved by the judgment entered, challenges it as the appellant. The parties will be referred to as they aligned themselves in the lower court.

The plaintiff filed his complaint in the District Court of Santa Fe County on April 13, 1951, setting out five separate counts. The First Count alleged that on January 11, 1951, the defendant, National Surety Corporation, secured a general indemnity agreement from plaintiff in connection with the execution of a bond covering U. S. Government Construction Contract numbered At–(29–1)–1087; that said indemnity agreement was secured from plaintiff by fraudulent representations as to the financial condition of defendant Hardy D. Moore, the principal on the bond, and by fraudulently representing that the indemnity agreement operated only as to contract No. 1087, whereas, in fact, it was operative as to bonds theretofore or thereafter executed by the defendant surety corporation on contracts of the defendant Moore. The plaintiff prayed for rescission of the indemnity agreement in this Count.

The Second Count incorporated by reference the first three paragraphs of Count One and followed by the allegation that on December 26, 1950, the defendant Moore, as owner of Smith-Moore Construction Company had secured a contract from Atomic Energy Commission for the remodeling of a certain structure at Los Alamos for an agreed consideration of $18,448.40, the contract being designated as hereinabove shown but to be referred to hereinafter simply as contract No. 1087. A copy of the contract was not attached for the stated reason that its length would unduly incumber the pleadings and because each defendant was said to possess a copy thereof.

The Second Count then proceeds to allege that on January 18, 1951, the plaintiff and defendant Moore entered into a written contract, a copy of which was attached to the complaint whereby the plaintiff agreed to advance the money required for the performance of the above mentioned contract and defendant agreed to have all progress payments under the contract issued directly to the Santa Fe National Bank with instructions to place the same to the joint credit of the plaintiff and Moore with a proviso that all checks drawn on the account should bear their joint signatures. This Count further alleged that the contract bound the parties to complete performance of the contract and to furnish all the material and perform all the work incident to the proper completion thereof; and, further, that upon completion of the contract profits should be determined by the amount of money remaining on hand after payment in full of all obligations arising out of performance of the contract and that the plaintiff should have 60% of all such profits on the first $6,000, the remaining 40% thereof to go to Moore and that profits in excess of $6,000 should be divided equally between the parties.

The complaint went on to say in the Second Count that, thereafter, defendant surety company assumed control of contract No. 1087 after plaintiff had advanced for the performance thereof $2,049.55 in reliance upon an oral agreement with defendants that funds received from the government under the contract "would be handled and disbursed in accordance with the provisions of the contract set out in the complaint," and "that plaintiff would be permitted to withdraw moneys advanced by him as rapidly as funds over and above those required to meet expenses were available"; that plaintiff had reimbursed himself $500 thus giving him a total investment in the contract of $1,549.55. That the defendant surety company in late January or early February, having assumed control of the contract, had induced defendant Moore to assign all payments under the contract No. 1087 to Albuquerque National Bank in violation of the provisions of the contract between plaintiff and Moore, set out in the complaint, and in violation of an alleged oral agreement between plaintiffs and defendant, resulting in loss of all control by plaintiff over the disbursement of funds to be received under the contract; that as a result of the assignment to Albuquerque National Bank, plaintiff had been unable to withdraw the aforesaid balance of $1,549.55 and defendant surety company had refused to release said funds to him. It was further alleged that the assignment by Moore of funds arising under the contract to Albuquerque National Bank was a breach by Moore of the contract as supplemented in Exhibits A. and B. attached

to the complaint, and that defendant National Surety Corporation maliciously and wilfully induced Moore to breach the contract with intent to injure plaintiff.

The allegations of the Second Count continued by saying that as a result of the actions of defendants in removing funds from the contract beyond plaintiff's control and in refusing to reimburse him the balance of $1,549.55, he had been unable to discharge his obligations for materials purchased by him and that his credit, essential in operating his business of building contractor, had been impaired to his damage in the sum of $5,000; that he had thereby been rendered unable to undertake construction work as he otherwise would have been able to do with a resulting loss of profits of $10,000; that he was informed and believed that his share of profits under the contract would amount to $3,600. Accordingly, he prayed for (1) $1,549.55 as the moneys he had invested in the contract; (2) for $3,600 as his share of the profits under the contract; (3) the sum of $15,000 damages for impairment of his credit and loss of profits; and, finally, (4) for $50,000 punitive damages. So much for the allegations of the Second Count.

In the Third Count the plaintiff incorporated by reference paragraphs 1, 2 and 3 of the First Count and paragraphs 2 to 14, both inclusive, of the Second Count and, in brief, set up an alleged oral agreement between him and the surety company to turn over supervision of the contract to him, the breach of said oral agreement and damages in the sum of $15,000 for the claimed breach of the oral agreement.

The Fourth Count is something altogether aside from contract No. 1087. It alleges an oral agreement with the defendant surety company to employ plaintiff as superintendent of a separate and distinct contract between Moore and the surety company for certain construction work undertaken by Moore in connection with playground facilities in a recreation area at Los Alamos, for which work as superintendent the plaintiff was to receive $500. Breach of agreement is alleged and damages in the sum of $500 are prayed for.

In the Fifth Count the plaintiff complains again of acts by defendants in connection with contract No. 1087. He incorporates by reference paragraphs 1, 2, 3, 4, 5a and 5b of the First Count and paragraphs 9, 10, 11, 12, 13 and 14 of the Second Count, as fully as if set out in the Fifth Count at length and charges the defendants with wantonly and maliciously having conspired together to defraud plaintiff, as thereinafter more particularly alleged, the overt acts claimed to have been committed in pursuance of the conspiracy by the alleged frauds set out in paragraphs 5a and 5b of the First Count in connection with the General Indemnity Agreement, the assignment of contract No. 1087 to

Albuquerque National Bank, the inducement of plaintiff to advance moneys for the performance of contract No. 1087, with the intention that the moneys should not be reimbursed and, further, that defendants fraudulently represented to the plaintiff that he would be entitled to his share of the profits under said contract, intending at all times that he should not have his share of such profits.

The cause was put at issue by an answer filed by National Surety Corporation denying all material allegations in the complaint. It then proceeded to set out a counterclaim on its own part by alleging that plaintiff and defendant Moore had requested it to execute payment and performance bonds under contract No. 1087 as required by the Miller Act, 40 U.S.C.A. § 270a et seq.; that it refused to execute such bonds because of a claim it had received from Loudermilk Brothers on an earlier bond executed on a contract performed by Moore; that thereupon the plaintiff and counter-defendant himself agreed to pay the $3,500 to Loudermilk Brothers and, that the surety company, in reliance on said agreement of plaintiff (counterdefendant) executed the bond for contract No. 1087; that the plaintiff failed and refused to pay Loudermilk Brothers the $3,500 and that counterclaimant (the surety company) thereupon paid the full amount of the Loudermilk claim in the sum

of $6,832.93. The prayer of the Fifth Count prayed judgment against counterdefendant in the amount of $3,500. Defendant Moore also answered and counterclaimed. The plaintiff answered the counterclaim of defendant National Surety Corporation denying the material allegations and raising certain legal defenses and answered the counterclaim of defendant Moore. With the cause thus at issue it proceeded to trial. At the trial the plaintiff put in evidence certain facts to be now set forth.

During the month of December, 1950, Hardy D. Moore, a building contractor at Los Alamos, New Mexico, was having financial difficulties. He was overdrawn at the bank on some fifteen payroll checks and by early January, 1951, he owed between $17,000 and $20,000. He was desirous of bidding on Atomic Energy Commission (A.E.C.) contract No. 1087, to do which he required a bid bond. He applied to defendant for such a bond. He made formal written application therefor and disclosed his financial status to the defendant in connection with such application. Moore's bid of $18,448.40 was the low bid on the job and he was awarded the contract.

At this time Moore was already in default on other jobs bonded by defendant on account of which it had paid out substantial amounts. Nevertheless, the archi-

tect's estimated cost of the job being only $13,012, which was confirmed by Moore and the defendant's local agent, Russell, the job gave promise of a profit. The contract was one for the remodeling of a building, taking out partitions, closing up some doors, putting in two windows, and constructing a small storage building.

One William J. O'Brien was primarily the representative of defendant as agent throughout the transactions occurring in this case with authority to pass upon the several matters involved as they arose. He possessed a considerable amount of discretion and defendant knew of his acts relating to the subject matter of the action and approved them. Also, Mr. James H. Russell, an agent of defendant, and Mr. Jack Dumbleton, an employee, were involved in certain matters affecting the action on behalf of defendant.

Although Moore was the low bidder, before the contract was actually executed it was necessary that he execute a performance bond. The defendant surety company refused to write the bond because of Moore's default on other bonds. It was then he, Moore, contacted the plaintiff, appellee, an experienced and qualified contractor and invoked his help. The latter got in touch with a Mr. Dumbleton, an employee of the surety company, who informed him Moore was already in default with the company on other bonds and that the company would certainly want some one to handle the money on contract No. 1087. A meeting followed in the office of Mr. James H. Russell, having been arranged by Mr. O'Brien, at which there were present O'Brien, Moore, the two Loudermilk brothers and the plaintiff.

At this meeting O'Brien made certain representations as to financial condition of Moore to effect that he had assets of about $20,000 and liabilities of around $10,000, or a net worth of $10,000. Both Moore and O'Brien thought there would be an $8,000 profit in the contract mentioned. Accordingly, and in reliance on these representations, the plaintiff entered into two contracts with Moore, the one giving plaintiff a half interest in contract No. 1087 having been signed scarcely five minutes before the one evidencing the partnership agreement between Moore and plaintiff. Both documents were signed January 11, 1951. They follow:

"Agreement.

"I, George W. Armijo, Jr., do hereby agree that for a consideration of $3,500.00 to be paid by me into the partnership of Hardy Moore and George W. Armijo, Jr. by February 1, 1951, shall receive a half interest in the profits of a certain contract with the Atomic Energy Commission, further described as Contract AT(29–1)–1087, dated December 26, 1950. The opera-

tion of said contract should be under the partnership to be formed by Hardy Moore and George W. Armijo, Jr. It is further understood and agreed that the $3,500.00 shall be paid to Loudermilk Bros. of Los Alamos, New Mexico not later than February 1, 1951.

"(Sgd) George W. Armijo, Jr."
The partnership agreement reads:

"Partnership Agreement.

"We, Hardy Moore and George W. Armijo, Jr., hereby agree to enter into a General Partnership Agreement for the purpose of completing a construction contract with the Atomic Energy Commission, AT (29–1)–1087, dated December 26, 1950; each of us to have equal authority and an equal share in the profits and liabilities of the partnership. All income of the partnership shall be deposited in a joint account and a bank of mutual choice, and any withdrawals from this account shall carry the signatures of each partner.

"(Sgd) Hardy D. Moore
"(Sgd) George W. Armijo, Jr."

It was at this meeting and as a result of the representations made as aforesaid that the general indemnity agreement referred to in the pleadings was executed by plaintiff, indemnifying the surety company against loss or damage on the performance bond executed for Moore.

It was only four days later that the plaintiff, as he testified, learned Moore had greatly misrepresented his financial condition. He promptly notified O'Brien, who urged plaintiff to go ahead with the contract and manage it but the plaintiff was dissatisfied and asked for a new contract with Moore. Accordingly, a new agreement was entered into with him bearing date January 18, 1951, under which plaintiff was to receive 60 per cent. of first $6,000 of profit and 50 per cent. of all above that sum. Checks were to be deposited in the joint account of plaintiff and Moore in Santa Fe National Bank at Santa Fe and all checks against the account to bear joint signatures of the parties. The January 18, 1951, agreement contained no provision for any payment by plaintiff to Loudermilk.

The foregoing agreement was supplemented by a second document dated January 19, 1951, signed by Moore agreeing to (as) sign all checks payable to Smith-Moore Construction Company under contract No. 1087 to joint account of plaintiff and Moore at Santa Fe National Bank. Incidental to all these agreements, assignments and supplements touching the affairs of plaintiff and Moore the former also relied upon and testified to a verbal understanding or agreement with Moore that he, plaintiff, should be permitted to withdraw from the partnership account moneys advanced by him for the performance thereof, as soon as funds

were available. The plaintiff notified the surety company through O'Brien of the January 18, 1951, contract within a day or two following its execution.

At this point in the affairs of the plaintiff and Moore, the sharpest conflict in the testimony of the parties appears. The evidence is substantial that the job was being mismanaged by Moore, which was called to the attention of O'Brien with a request that he, plaintiff, be allowed to take over completion of the job, a request which plaintiff understood was agreeable to O'Brien for the surety company. The affairs of the partnership in connection with the contract had now reached such a state that the surety company, as it claimed the right to do under its general indemnity agreement with plaintiff, as well as under a document signed by Moore on February 16, 1951, assumed control of the contract to the extent of recognizing Moore as in complete charge of its performance, so far as plaintiff was concerned. It recognized an assignment by Moore to Albuquerque National Bank of all moneys due or to become due under the contract No. 1087, as security for a loan to be used in the performance thereof. Checks against the account in the bank into which the moneys were to be paid were to be applied by the bank to said indebtedness and balance to be subject to checking only on checks of Moore countersigned by a representative of the surety company.

Of course, the viewpoints and the testimony of the parties vary widely as to the right of the surety company to take the course it did, the company insisting that plaintiff voluntarily announced he was withdrawing from the contract and would have nothing further to do with it, all this on the advice of counsel. The plaintiff on the other hand insists that notwithstanding the mismanagement of Moore, performance of the contract was going forward, and "did not appear to be in any difficulty except for mismanagement." The plaintiff had further funds available to put into the contract, "had he been allowed to proceed * * * ample funds were available to prosecute the contract," as his counsel here appraise the testimony. Naturally, on such a wide conflict in the testimony, the jury's verdict establishes the plaintiff's version before us.

The plaintiff learned by accident of the assignment to the Albuquerque National Bank and was thereafter barred from all control over or participation in performance of the contract. It is his theory as presented to us by counsel that he was forced off the job and Moore put in complete control to the end that the entire profits could be taken over in Moore's name and be applied by the surety company to indebtednesses owing it by Moore by reason of his defaults on other jobs. The surety company on the other hand takes the position that the sole condition upon which, according to plain-

tiff's own testimony, he was to receive reimbursement of moneys put into the contract, namely, as moneys were available, never in fact came to pass. Hence, that the plaintiff was not damaged. It challenges sufficiency of the evidence to support the verdict returned and the sufficiency of the verdicts to support a judgment against it in any amount, claiming also that the court committed prejudicial error against it in denying its motion to elect on which count, the 2nd or 5th, it could go to the jury.

The trial court at the close of all the testimony in the case dismissed the First, Third and Fourth counts of the complaint and, also, dismissed the defendant's counterclaim. It struck, or dismissed, sub-paragraph (b) of paragraph 3 of the Fifth Count. Before submission of the case to the jury the counsel for defendant surety company moved that plaintiff be required to elect as between the Second and Fifth counts on which he would go to the jury. Whereupon the following colloquy between the court and counsel occurred, to wit:

"The Court: Now, what do you say to the demand made by counsel?

"Mr. Bigbee: I don't believe we can be required to elect in this type of case, your Honor, for the reason there is evidence to support both the Second and Fifth Count, and while the Second Count involves the same damages, they

both involve different wrongs, and the Jury might find that there was no conspiracy.

"(Whereupon, Mr. Bigbee argued his rejection of the demand made by counsel.)

"The Court: Both counts will be submitted to the jury.

"Mr. Marron: May I have an exception to all these rules of the Court?"

Thereupon and following the court's instructions the cause was submitted to the jury under 6 separate forms of verdict, upon which the jury returned four verdicts in favor of plaintiff, and none in favor of the defendants. The verdicts and the jury's action thereon are as follows:

"No. 1, Verdict—Count II.

"We, the jury, find the issues of the Second Count in favor of Plaintiff and against Defendants, and assess Plaintiff's damages in the sum of $1,600.00.

"/s/ Mrs. T. P. Amsden
"Foreman"

"No. 2, Verdict—Count II.

"We, the jury, find the issues of the Second Count in favor of Plaintiff and against Defendants, and assess Plaintiff's actual damages in the sum of $2,000.00 and his punitive damages in the sum of $5,000.00.

"/s/ Mrs. T. P. Amsden
"Foreman"

"No. 3, Verdict—Count II.

"We, the jury, find the issues of the Second Count in favor of Defendants and against Plaintiff.

"(Unsigned)
"Foreman"

"No. 4, Verdict—Count V.

"We, the jury, find the issues of the Fifth Count in favor of Defendants and against Plaintiff.

"(Unsigned)
"Foreman"

"No. 5, Verdict—Count V.

"We, the jury, find the issues of the Fifth Count in favor of Plaintiff and against Defendants, and assess Plaintiff's actual damages in the sum of $2,-000.00 and his punitive damages in the sum of $3,000.00.

"/s/ Mrs. T. P. Amsden
"Foreman"

"No. 6, Verdict

"We, the jury, in the above styled and numbered cause, find that defendants, on the *30th* day of September, 1951, wrongfully withheld the amount of $1,603.68, advanced by the plaintiff for performance of Contract 1087, and assess the damages of the plaintiff against the defendants in the above amount with interest thereon from said date.

"/s/ Mrs. T. P. Amsden
"Foreman"

We think the trial judge erred in failing to instruct the jury that, although denying defendant's motion to compel an election as between counts 2 and 5 by permitting both to go to the jury; it should, nevertheless, confine itself to one award of compensatory damages and could not, as it did, make multiple awards of same on the one cause of action involved. As the matter stands it is clear multiple damages have been awarded to the plaintiff. In justice, a judgment thereon contains an inherent defect and should not be permitted to stand. Compare Schaefer v. Whitson, 32 N.M. 481, 259 P. 618. The cause of action was one for damages growing out of the A.E.C. Contract No. 1087. The plaintiff admits that his Second Count and Fifth involve the same damages. The jury returned two verdicts on the Second Count, one assessing damages at $1,600 and one assessing actual damages at $2,000 and punitive damages at $5,000. It also returned a verdict on the Fifth Count, assessing plaintiff's actual damages at $2,000 and his punitive damages at $5,000. Then there is a verdict of $1,-603.68 as moneys found to have been wrongfully withheld of moneys advanced by plaintiff for performance of the contract.

The net result is that when we view an overall picture of the damages awarded, we have verdicts aggregating $15,203.68, as damages arising out of breach of a building contract the total contract price of which was only $18,448.40. We think an apprais-

al of the plaintiff's two counts submitted to the jury disclose but a single cause of action, arising from one transaction and it need not have been made the basis of half a dozen different counts. Mares v. New Mexico Public Service Co., 42 N.M. 473, 82 P.2d 257. Doing so could only result in confusion to the court and jury alike as evidenced by the submission to the jury of six separate verdicts and four special interrogatories and the latter's award of multiple damages. In 1 C.J.S., Actions, § 64, page 1184, the author states:

> "In determining whether more than one cause of action is stated, the main test is whether more than one primary right or subject of controversy is presented, other tests being whether recovery on one ground would bar recovery on the other, whether the same evidence would support the different counts, and whether separate actions could be maintained for separate relief. The substance, rather than the form, of the pleading is to be regarded, and not the pleader's intention, nor whether different kinds of relief or objects are sought."

See, also, Parker v. Boston & M. R. R., 84 Vt. 329, 79 A. 865; Louden Machinery Co. v. Day, 104 Vt. 520, 162 A. 370; Moskow v. Smith, 318 Mass. 76, 60 N.E.2d 373; and Southern Surety Co. v. Dolese Bros. Co., 149 Okl. 31, 299 P. 211.

Counsel for defendant asserts that both the second and fifth counts are based on a single breach of contract, caused by the same acts of defendants and praying for the same damages. They point out that the second count is based on the theory that defendant, National Surety Corporation, induced defendant Moore's breach of contract by procuring the assignment of the construction contract, and that the fifth count was based on the theory of a conspiracy by defendants Moore and National Surety Corporation to commit the same breach. But the conspiracy allegation of the fifth count states no separate cause of action, as counsel assert, but merely restates the same issue and claim set up in the second count, on a different theory. However, civil conspiracy unlike criminal conspiracy, is not of itself actionable; the gist of the action is the damage arising from the acts done pursuant to the conspiracy.

The rule is stated in 11 Am.Jur. 577, § 45, under Topic, "Conspiracy" and is as follows:

> "§ 45. Nature and Basis of Liability.
>
> "Accurately speaking, there is no such thing as a civil action for conspiracy. The action is for damages caused by acts committed pursuant to a formed conspiracy, rather than by the conspiracy itself; and unless something is actually done by one or more of the conspirators which results in damage, no civil action lies against anyone. The

gist of the civil action for conspiracy is the act or acts committed in pursuance thereof—the damage—not the conspiracy or the combination."

In Pullen v. Headberg, 53 Colo. 502, 127 P. 954, 955, the court said:

"At common law a 'conspiracy' is defined as a combination between two or more persons to do a criminal or unlawful act or a lawful act by criminal or unlawful means. In criminal prosecutions the gist of the action is the conspiracy. *But in civil cases the gist of the action is not the conspiracy,* but the damages resulting from it, and unless a civil action in damages would lie against one of the conspirators, if the act was done by him alone, it will not lie against many acting in concert. The object of the criminal action is punishment against the wrongdoers. The object of the civil action is to recover any damages resulting from carrying out the conspiracy." (Emphasis ours.)

See, also, Hansen v. Humphrey, 218 App. Div. 291, 218 N.Y.S. 197, and Shannon v. Gaar, 233 Iowa 38, 6 N.W.2d 304.

■ We recognize the right of a party plaintiff to set forth a cause of action arising on contract on different theories to accommodate his pleading to any variance between the pleading and the proof. Ross v. Carr, 15 N.M. 17, 103 P. 307, and Francis-

can Hotel Co. v. Albuquerque Hotel Co., 37 N.M. 456, 24 P.2d 718. An instance of this form of pleading is the setting up of an express contract in one count and an implied contract on another as in the case of Bush v. Mattingly, 62 Ariz. 483, 158 P.2d 665. But a plaintiff has not the right, where proof is all in, to go to the jury on both counts with the jury privileged to return a verdict favorable to him on *both* counts, as in the present case.

■ There is an abundance of authority to the effect that code provisions similar to ours, calling on a plaintiff to set forth in his petition a plain and concise statement of the facts constituting his cause of action, without unnecessary repetition, do not prohibit the pleading a single cause of action in different counts, for the purpose of varying the form of allegation to meet any possible state of the proof. An example of this, as already shown, is the pleading of an express contract in one count and an implied contract in another. Ross v. Carr, supra; Bush v. Mattingly, supra. See, also, Schmidt v. Merchants Despatch Transportation Co., 270 N.Y. 287, 200 N.E. 824, 104 A.L.R. 450; Clark v. Dulien Steel Products, Inc., 54 Cal.App.2d 92, 128 P.2d 608; Williams v. Smith, 71 Ga.App. 632, 31 S.E.2d 873; Wilson v. Milner Hotels, Inc., 116 Mont. 424, 154 P.2d 265.

Without exception, however, where a single cause of action is pleaded in separate

counts, it is taken for granted that but a single recovery may be had. As said in Ross v. Carr, supra [15 N.M. 17, 103 P. 309]:

"* * * So when two distinct and different claims are based upon the same instrument, *although the plaintiff may be entitled only to a single satisfaction,* both may be stated in the same petition, and should, of course, be stated in different counts." (Emphasis ours.)

And in Schmidt v. Merchants Despatch Transportation Co., supra [270 N.Y. 287, 200 N.E.2d 826], the court emphasizes the principle, as follows:

"We assume that the allegations in the complaint of five 'separate and distinct' causes of action, set forth, in different forms, only a single wrong for which there may be but one recovery. *That must be true, for evidently there can be but one satisfaction awarded for a single injury.*" (Emphasis ours.)

While the plaintiff made no special request for an instruction telling the jury they could not award compensatory damages on both the second and fifth counts, we think plaintiff's admission that both counts did involve the same damages, when viewed in the light of defendant's motion to compel an election by plaintiff as to which count he would take to the jury, sufficed to alert the trial judge's mind to the danger that what

actually happened, very likely would happen, and called upon him on his own motion to give a cautionary instruction warning against it. Compare State v. Williams, 39 N.M. 165, 42 P.2d 1111; State v. Mitchell, 43 N.M. 138, 87 P.2d 432; State v. Jones, 51 N.M. 141, 179 P.2d 1001. The failure to so instruct entitles the defendant to a new trial.

And in as much as the case must be sent back for retrial, there is further error in the record to which we feel it our duty to call attention. This is so, even though as counsel for plaintiff charges and the record indicates defendant failed to reserve such error for review by making objection to the reception of objectionable evidence when tendered in evidence. We refer to testimony touching the measure of damages. Of course, the plaintiff was entitled to recover as a proper item in the measure of damages the loss of profit to accrue to him had he been permitted to proceed in the performance of contract No. 1087. We think the parties are not in disagreement on this proposition.

But he was not entitled to show in evidence as a part of his damages, anticipated and hoped-for profits on a half dozen or more contracts or enterprises, wholly aside from the one in question, which but for an impaired credit consequent on defendant's acts, he might have undertaken or carried to completion.

The plaintiff's counsel have divided the damages recovered into three categories: (1) the reimbursement of moneys advanced by him for the performance of the contract; (2) the plaintiff's share of the profits realized or which should have been realized from the contract; (3) damages arising from matters other than the two above mentioned categories. It is evidence of damages on items thereof falling in the last category on which the court committed error, approximating a kind fundamental in character, in the admission of evidence. As an instance of what we are talking about we may cite (1) testimony of loss of profits on an alfalfa crop being grown by plaintiff which his impaired credit rendered him unable to complete. (2) Loss of wages over the same period for which profits on jobs next mentioned are made recoverable. (3) Loss of profits on Baptist Church job. (4) Loss of profits on Drury Co. job. (5) Loss of profits on Perez building contract. (6) Loss of profits on other contracts.

Counsel for the plaintiff summarizes in his answer brief items of damage claimed to find support in the evidence as follows:

"Loss of wages .......... $ 2,550.00
Profits and reimbursement
   on Contract 1087 ...... 8,000.00
Loss on Baptist Church
   job .................. 1,300.00
Loss on Drury Company
   job .................. 1,800.00
Loss of profits on other
   contracts ............. 10,000.00
Loss of the Perez con-
   tract ................. 5,000.00"

Let us examine some of the evidence and the substance of other testimony on which some of these items rest, all based wholly on speculative and conjectural evidence of the most obvious type. Take for instance the so-called Perez contract. He was a wealthy resident of the Ft. Sumner area and sent a representative to Sante Fe to contact a builder. He talked with the plaintiff and plaintiff claims he could have had the contract but for his impaired financial condition growing out of his trouble with the defendant over contract No. 1087. No contract with Perez was ever drawn up or entered into but $5,000 damages as loss of profits on the Perez contract are said to support the verdict. Like speculative testimony supports the presence in the record of $10,000 as lost profits on other unnamed and unidentified contracts. The kind of testimony supporting the items resting in the third category above mentioned is reflected by the following from the plaintiff himself while on the stand, testifying on his own behalf, to wit:

"Q. What contract jobs could you have obtained if you had been allowed to proceed and continue with this contract? A. If things had gone as planned and managed properly, I had plan-

ned to have $8,000.00 in the bank and make as good as eighty thousand dollar bid with ten per cent in the bank, any small contract requires that you have that amount, and completed it in sixty or seventy days. I might have gotten two or three other chances to build, and might have made $10,000.00 profit, but I didn't have any capacity to bid.

"Q. What about the Baptist Church? A. I had that job prior to taking this one and was half way through, and with that equipment being used there I would have had $1800.00 profit, but by the time I got through with all of this, with Mr. Russell, Mr. O'Brien and the Bank, I spent more than I should have, and I wound up making $500.00."

The theory on which items of damage of this character were let in would easily support the admission of testimony by plaintiff that his impaired credit consequent on the breach of this contract prevented the purchase by him of an interest in a drilling oil well tendered him, or which he previously had agreed to purchase, in which oil later was discovered, thereby mushrooming the value of that interest to the sum of $100,000, and furnishing support for a judgment in that amount against defendant. Obviously testimony of the character indicated was highly prejudicial and should be excluded on a retrial.

The defendant by counterclaim sought recovery against plaintiff for failure to pay into the partnership the sum of $3,500 promised in the purchase agreement executed by plaintiff in acquiring one-half interest from Moore in Contract No. 1087 which the agreement recites was to be paid over to Loudermilk Brothers of Los Alamos by February 1, 1951, and which defendant alleged was to reduce a liability of defendant (counterclaimant) to Loudermilk Brothers on account of a default by Moore on an earlier contract bonded by defendant. In other words, says defendant, as the beneficiary of this agreement on plaintiff's part it has been damaged in the sum mentioned above for which it prays judgment against him.

At the conclusion of all the evidence, the trial court sustained a motion to dismiss the counterclaim of defendant Moore. The latter's appeal having been dismissed on plaintiff's motion takes Moore out of the case before this Court and there is nothing for us to consider in connection with the trial court's dismissal of his counterclaim. In like fashion, however, at the conclusion of the evidence, the trial court sustained a motion to dismiss the counterclaim of the defendant surety company which together with colloquy between court and counsel and the trial court's action on the motion, will be shown below, to wit:

"We also move that the Cross Complaint of National Surety be dismissed

for the reason it is shown there was never any consideration for any promise of Armijo to pay $3,500.00 to Loudermilk, which is the sole basis of that agreement, admitted that Hardy D. Moore's rights were determined by the —well, say, the contract prepared by Ripley, and that would necessarily follow. We move to dismiss both Cross Complaints on the ground there is no evidence from which a jury could find in favor of the Cross-Complainants. And also, as to National Surety, there is no damage to National Surety, and no mutuality for any agreement, and the contract shows on its face they were not a party to the agreement, nor privy to it.

\*     \*     \*     \*     \*     \*

"The Court: The Motion will be sustained on the Counter Claim of the Defendant Moore, and will be dismissed.

"Mr. Apodaca: Note an exception, your Honor.

"The Court: What do you say in opposition to the Motion to dismiss your Counter Claim?

"(Whereupon, Mr. Marron presented arguments to the Court in regard to the Motion to Dismiss the Counter Claim of the Defendant National Surety Corporation.)

"The Court: I am going to sustain the Motion to strike the Defendant,

National Surety Corporation's Counter Claim.

"Mr. Marron: Note an exception."

We think there was no error in the action of the trial court in sustaining the plaintiff's motion to dismiss the defendant surety company's counterclaim.

■ We have taken under advisement along with the case on the merits a motion to dismiss because of defendant's failure to comply with our Supreme Court Rules touching the preparation of briefs. Since no jurisdictional ground in support of the motion is advanced, Rule 16, subd. 4, and to grant the motion would further delay final disposition of litigation which should reach final determination as speedily as possible, the motion to dismiss will be denied. We can see no prejudice to plaintiff as we have viewed and resolved the questions deemed decisive.

In considering this appeal we have had to examine a mass of exhibits and testimony extending over 592 pages of the transcript as well as briefs of extraordinary length presented by counsel for both parties. Under such condition it has been most difficult to reach the determinative conclusions announced. We are well satisfied, however, that such error dwells in the record as to warrant a reversal. Accordingly, the cause will be remanded to the district court with instructions to it to set aside its judgment

and award a new trial. The costs of the appeal will be apportioned, the plaintiff (appellee) paying two-thirds of such costs and the defendant (appellant) one-third.

It Is So Ordered.

McGHEE, C. J., and COMPTON, LUJAN and SEYMOUR, JJ., concur.